Ultimate Creations, Inc. v. THQ Inc.
USDC, Central District of Arizona
Case No. CV05-1134-PHX (SMM

INDEX OF EXHIBITS TO
DECLARATION OF KATHARINE J. GALSTON IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A | Excerpts from the Transcript of the Deposition of Warrior taken on February 13, 2007 |
| B | Excerpts from the Transcript of the Deposition of Kathy Vrabeck taken on February 15, 2007 |
| C | Exhibit 1 to the Deposition of Warrior |
| D | Documents Produced by Plaintiff, Bates-labeled UCI 000016-000017 |
| E | Exhibit 8 to the Deposition of Warrior |

1659547

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

ULTIMATE CREATIONS, INC., an )
Arizona corporation, )
                                  )
     Plaintiff, )
                                  )   No. CV-05-1134-PHX-SMM
vs. )
                                  )
THQ INC., a corporation, )
                                  )
     Defendant. )
                                  )

VIDEOTAPED DEPOSITION OF WARRIOR

Phoenix, Arizona
February 13, 2007
1:16 p.m.

Reported by:
CARRIE SMALANSKAS, RPR
Certified Reporter
Arizona CR No. 50355

# CERTIFIED
# COPY

Page 1

EXHIBIT A, page 3

1    professional wrestler?

2         A.   I used to be in sports entertainment as a

3    professional wrestler, yes.

4         Q.   Did you perform the character called the

5    Ultimate Warrior?

6         A.   Yes.

7         Q.   Did you -- when you performed the character

8    called the Ultimate Warrior, was that with the WWE -- and

9    let me clarify that for the record.  When I say "the WWE,"

10   I am referring to the World Wrestling Entertainment, Inc.,

11   I think as it is known today, but it has had many

12   names such as Titan --

13        A.   Yes, Titan Sports, World Wrestling --

14             MR. MAYNARD:  Guys --

15             MS. GALSTON:  I'm sorry.

16        Q.   BY MS. GALSTON:  -- WWF, World Wrestling

17   Federation, Inc., and to be clear, I will probably just

18   say "WWE," but you understand that I mean all the previous

19   entities, such as Titan Sports, WWF, the World Wrestling

20   Federation?

21        A.   Yes.

22        Q.   To get back to my question, did you perform the

23   Ultimate Warrior character with the WWE?

24        A.   No.

25        Q.   Okay.  When --

Page 8

EXHIBIT A, page 4

1          A.   Well, yes, I'm sorry, the whole thing that you

2     gave me, the WWF, yes, I always call it Titan Sports, but

3     yes --

4          Q.   Would it make you more comfortable if we called

5     it Titan Sports?

6          A.   No, I will catch on in a second or two.  Hit me

7     upside the head with a chair or something and we will get

8     it.  My fault, yes.  WWE meaning WWF, yes.

9          Q.   Okay.  When did you wrestle with WWE?

10         A.   I started in 1986, and the last time I appeared

11    for it, ma'am, was in 1996.

12         Q.   Did you keep wrestling as the Ultimate Warrior

13    after you left the WWE in 1996?

14         A.   No.

15         Q.   Did you continue wrestling?

16         A.   I wrestled in 1998 as Warrior.

17         Q.   As Warrior.  Did you ever wrestle as -- as the

18    character Warrior with the WWE or was that a new

19    character?

20         A.   It was the same character.

21         Q.   What do you mean by "same character," just so I

22    am clear?

23         A.   Same character and identity.  There was -- it

24    was in 1998 and there was a dispute in a litigation I had

25    with Titan sports, WWE at the time.  There was -- over the

Page 9

EXHIBIT A, page 5

1    name "ultimate," but there was no dispute over the

2    character's identity and look or behavior.

3         Q.   You don't still wrestle professionally, do you?

4         A.   No.

5         Q.   When did you retire from wrestling?

6         A.   Professional wrestlers retire?

7         Q.   Well, if they -- if you did retire.  When did

8    you stop wrestling with a professional organization?

9         A.   In 1998 was the last time I wrestled.

10        Q.   Okay.  What organization was that with?

11        A.   That was with World Championship Wrestling.

12        Q.   So you haven't appeared as a wrestler in

13   wrestling competitions since 1998?

14        A.   Not inside the ring.

15        Q.   Do you meet -- strike that.  What have you -- if

16   you -- let me strike.

17             What have you been doing since 1998?

18             MR. MAYNARD:  Objection to the form.

19             Go ahead and answer.

20             THE WITNESS:  Getting on with my life.  I built

21   another career.

22        Q.   BY MS. GALSTON:  What is that other career?

23        A.   I work traveling around the country going to

24   college campuses.  I have involved myself with some young

25   American youth groups out of Washington, D.C., and I go

Page 10

EXHIBIT A, page 6

1    exactly the same, but over the years there has been

2    different variations of the same thing.  I would say the

3    trademark logo that I have registered with the USPTO is

4    well-recognized and identifiable with the Ultimate Warrior

5    as it would be if I took that and put it on my face

6    three-dimensionally.

7           Q.    You just mentioned the Ultimate Warrior logo.  I

8    am going to introduce as an exhibit -- and I will ask the

9    court reporter to mark it and then she will give it to

10   you.  This is a printout from the U.S. Patent and

11   Trademark Office.

12          (Deposition Exhibit No. 1 was marked for

13   identification by the reporter.)

14          Q.    BY MS. GALSTON:  Is this the Ultimate Warrior

15   logo that you just spoke of?

16          A.    I would say yes.

17          Q.    I am going to introduce another exhibit here so

18   we can be clearer.

19          MS. GALSTON:  If the court reporter could mark

20   this as Exhibit 2.

21          (Deposition Exhibit No. 2 was marked for

22   identification by the reporter.)

23          Q.    BY MS. GALSTON:  Exhibit 2 you have in front of

24   you, this is the complaint that you filed in this action;

25   is that correct?

Page 13

EXHIBIT A, page 7

1      A.   Yes.

2      Q.   Now, if I could direct your attention to

3   paragraph 15 of the complaint, which states, "Upon

4   information and belief, the video games were created in

5   such a way that one playing the game can create the

6   Ultimate Warrior character including using the costume,

7   the Ultimate Warrior logo, face paint, marks, trade dress

8   and moves that were used by the Ultimate Warrior and

9   associated with the Ultimate Warrior," is the Ultimate

10  Warrior logo that you are referencing in the complaint, is

11  that the same as what we have just marked as Exhibit 1,

12  the registered trademark?

13          MR. MAYNARD:  Objection to the form.

14          Go ahead and answer.

15          THE WITNESS:  Yes.

16      Q.   BY MS. GALSTON:  So the Ultimate Warrior logo is

17   your registered logo -- your registered mark rather.  Are

18   there any other symbols or logos that you claim appear in

19   the games other than this mark?

20      A.   I would say many things starting with the

21   character running to the ring, his ring entrance, how he

22   behaves on the ring apron, the shaking of the ropes, a

23   sequence of moves that are identifiable with the Ultimate

24   Warrior character, other in-the-ring behaviors, and the

25   strings on the arm, the whole look, the logo painted on

1          MR. MAYNARD:  No, you are fine.

2          THE WITNESS:  -- video clip to define it.

3      Q.   BY MS. GALSTON:  Are the moves you are

4   referencing -- to direct you back in the complaint, are

5   the moves you are referencing the same moves that you

6   define in paragraph 9 of the complaint, which is on page 3

7   which states:  The Ultimate Warrior became a well-known

8   character as did his trade dress and marks for the

9   sequential move sets, the moves?

10          And then in the complaint it defines the moves

11   in terms of this sequential signature move sets.

12      A.   I would say the sequential signature moves and

13   also in moves separate from one another.

14      Q.   What are the sequential signature moves?

15      A.   The running to the ring, jumping up on the apron

16   as it is called, the outer edge of the --

17      Q.   Just to go back --

18          MR. MAYNARD:  Well, let him -- you asked him.

19   Let him finish the answer before you ask another question.

20      Q.   BY MS. GALSTON:  Okay.  Running to the ring?

21      A.   Running to the ring, jumping up on the ring

22   apron.

23      Q.   Is that all part of your entrance into the ring?

24      A.   That is all part of the entrance, the Ultimate

25   Warrior.  It is the Ultimate Warrior ring entrance.

Page 17

1           Jumping up on the apron, skirting back and forth

2    on the first apron that I jump up on, turning around,

3    running to the ring post, going around the outside of the

4    ring post, shuffling backwards down a second ring apron,

5    doing a complete 360 with my body, grabbing the ropes,

6    leaning back, shaking the ropes, running in the ring,

7    crawling through the ropes, running in the ring, back and

8    forth hitting the ropes, running up into the corners,

9    standing on the second rope, facing the crowd, raising my

10   arms up over my head.  That would be the Ultimate Warrior

11   ring entrance.

12        Q.   So the Ultimate Warrior ring entrance which you

13   just described, that is one of the sequential signature

14   moves?

15        A.   It would be, and I would also say that each one

16   separate from the other is a move.  Running to the ring is

17   something only the Ultimate Warrior did.  Shaking the

18   ropes is only something that the Ultimate Warrior did.

19        Q.   So you are saying no other wrestlers ran to the

20   ring?

21        A.   No.

22             MR. MAYNARD:  Well --

23             THE WITNESS:  There may have been other

24   wrestlers that ran to the ring but not as part of their

25   signature every-time ring entrance.  I mean, there are

                                                    Page 18

EXHIBIT A, page 10

1    other wrestlers that run to the ring in certain skits that

2    are set up, but as a signature move that is identifiable

3    with one particular character, running to the ring is

4    Ultimate Warror's.

5         Q.   BY MS. GALSTON:  This ring entrance that you

6    just described to us, this is pretty complicated.  Did you

7    do this ring entrance every time the exact same way?

8         A.   Pretty much, yes.  Not every time, no.  But I

9    would say eight to nine times out of ten, yes.

10        Q.   So you often used this entrance?

11        A.   On practically every occasion.

12        Q.   Is your claim if a wrestler now, for example,

13   ran into the ring and jumped up on the ropes, maybe

14   grabbed the ropes and shook them, would that be a

15   violation of your rights?

16             MR. MAYNARD:  Objection to the form.

17             Go ahead and answer.

18             THE WITNESS:  I would say that the case couldn't

19   -- could probably -- might possibly be made.  I would

20   leave it to the lawyers to decide that, but I would say

21   more that it is done out of a homage to the Ultimate

22   Warrior character that was done recently by a character at

23   WWE called Batista, who shook the ropes, and when

24   questioned about it said that it was his homage to me

25   because he enjoyed the performances of the Ultimate

Page 19

EXHIBIT A, page 11

1   character, and there is an unspoken agreement in the

2   industry, or it could be a spoken one from people who run

3   the company, that once a character reaches a certain level

4   of popularity and contributes to the business financially

5   in a successful way, other people don't just come in and

6   use those moves or behave like another already successful

7   character.

8       Q.   Have you sued any other wrestlers for using your

9   moves?

10      A.   No.

11      Q.   Do wrestlers commonly sue each other for using

12  each other's signature moves?

13      A.   I don't know.

14      Q.   You mentioned there were a number of sequential

15  signature moves -- move sets and you described the ring

16  entrance.  What are the other signature move sets?

17      A.   Um-hum.  The finishing sequence of moves.

18      Q.   And what is that?

19      A.   A shaking of the ropes from the inside, a

20  working my way up the ropes.

21      Q.   And just to interrupt you for a second, is this

22  one move set you are describing to me now, one finishing

23  sequence?

24      A.   It is a sequence of moves.

25      Q.   Okay.  We will call this sequence two perhaps?

Page 21

EXHIBIT A, page 12

1      A.    Okay.

2      Q.    Okay.  So a running -- a shaking the ropes

3  again.

4      A.    Standing on the inside, working my way up the

5  ropes usually starting with the second rope, shaking it,

6  work my way up until I am standing, shake the ropes,

7  leaning back, both hands on the ropes.

8         Usually the opponent -- I start running in place

9  and run in a big full circle inside the ring or a small

10  circle, depending on what the reaction of the crowd was,

11  and typically the opponent will be, as I am getting fired

12  up, making what you would call a comeback, he will be

13  hitting me, possibly on the back, sometimes he will,

14  sometimes he won't, and I will turn around in a full rage

15  type of thing, and then I will run and hit the ropes, and

16  I will give them three, what are called clotheslines.

17         Each time I give them a clothesline, the

18  opponent falls on his back.  I sort of run through to the

19  other rope.  As I come off the other rope, the opponent is

20  back up facing me.  I hit them with another clothesline.

21  They fall down on their back.  I run through them again,

22  hit the rope again, come back at them with a third

23  clothesline, and generally stop there, run in place, as

24  the opponent lies there.

25         And depending on how heavy the opponent was,

Page 22

EXHIBIT A, page 13

1    whether I could put him up in a gorilla press or not, I

2    would run and hit the ropes and fly off and give him a

3    shoulder tackle, flying shoulder block.

4          After that, I walk around the ring, and I do

5    this with my arms, up and down, pump them up and down,

6    meaning that I am signaling the crowd that I am going to

7    gorilla press the person, and, again, if it was an

8    opponent I could lift over my head, I would gorilla press

9    them, and I would drop them behind me, have them over my

10   head and I would just walk out, they would fall down on

11   their belly.  I would run and hit the rope and I would

12   splash them on their back.

13        Q.   It sounds like this is a pretty carefully

14   choreographed sequence, isn't it?

15        A.   If you think so.

16        Q.   Does the other wrestler have to cooperate to do

17   this move, to do this sequence?

18        A.   To have any wrestling match in sports

19   entertainment, the other wrestler always has to cooperate.

20        Q.   So the other wrestler knows what moves you are

21   going to do; is that right?

22        A.   Right.  Yes.

23        Q.   So you are sort of doing the sequence together

24   then for the entertainment of the crowd?

25        A.   It is a stretch, isn't it?

Page 23

EXHIBIT A, page 14

1       Q.   I don't know.  I am not that familiar with

2   wrestling as you are.

3       A.   I would say no.  I would say it is a stretch.

4       Q.   It is a stretch to say.  But the other wrestler

5   has to participate in this?

6       A.   Well, he doesn't help me do my part.

7       Q.   But he knows what is coming?

8       A.   Unless I change my mind.

9       Q.   Okay.  Does the other wrestler share in this

10   move with you or would you think --

11       A.   Nobody does any of the work that I do in all the

12   moves that I laid out for you.

13       Q.   Did you do this move the same way every time,

14   this finishing move?

15       A.   I would say nine times out of ten with the

16   slight variations of whether or not I could press them

17   over my head.  If not, there wouldn't be a press slam.  I

18   would pin them after the flying shoulder block, shaking

19   the ropes on the inside when I was making what is called a

20   comeback.

21           Depending on what the reaction of the crowd is,

22   I would milk that for as long as I could.  If the crowd is

23   really behind it, then you do more running around the ring

24   before I would actually run off and hit off the rope and

25   start delivering my clotheslines.

Page 24

EXHIBIT A, page 15

1    But, yeah, to the second, I mean, is it timed

2  like that?  It could vary, but the general, you are going

3  to get that every time, eight or nine times out of ten.

4    Q.   Are there any other moves that are referenced by

5  this sequential signature move sets?  You have given me

6  two move sets so far.

7    A.   Those are the ones that I most recognized in the

8  clips that I saw.

9    Q.   So you have no reason to believe that there is

10  other move sets of yours in the game?

11    A.   There are a toolbox of moves that all wrestlers

12  use that would be familiar to a bunch of different people,

13  but typically an entrance, distinct music that is

14  associated with an entrance, the way a match goes home,

15  meaning the time is up in the match and you are getting

16  ready to go home, finish the match, you are done with your

17  job for the night, there are -- those are the things that

18  are -- those sequential move sets are identifiable for all

19  superstar wrestlers in the way they would wrap up a match

20  or go home or make a comeback.

21    In between there, there is a lot of different

22  moves and a lot of different activity, like punching.

23  Punching would not be -- that all wrestlers use.

24    Q.   You are just describing for me general wrestling

25  moves, things common in the industry that might appear in

Page 25

EXHIBIT A, page 16

1  a wrestling game?

2       A.   No, the moves that I described -- like I said,

3  you could see them as sequential move sets, but each one

4  apart from the other is also -- all alone is a signature

5  move of the Ultimate Warrior, I would say.

6       Q.   So each element of the two move sets you gave me

7  you claim is a trademark or a signature move in its own

8  right?

9       A.   Well, if we walk through it, I could tell you

10  which ones weren't and which ones are.  I would say some

11  of them are.

12       Q.   What does it depend on?

13       A.   Well, for a silly example, I guess, something

14  that other wrestlers don't do, I mean, that other

15  wrestlers -- it is not identified with their repertoire,

16  what they do in the ring, their character, their identity.

17       Q.   So did you -- when did you use these moves?

18            Do you understand my question?

19       A.   No, not really.

20       Q.   Let me rephrase.  Did you -- strike that.

21            Have you ever -- strike that.

22            You say you used these moves when you were

23  wrestling as the Ultimate Warrior.  Did you ever use the

24  moves for any other purpose other than wrestling or did

25  you ever -- was there any other occasion you would use

Page 26

1   these moves outside of the ring?

2       A.    Sometimes when I am dancing.

3       Q.    When you are dancing.

4             Did you gorilla press your partner?

5       A.    No.

6       Q.    So you haven't -- so these were moves that you

7   used in the ring, professional wrestling moves, right?

8       A.    Right.   I am sure I may have used them at some

9   time being funny or something with my own children or

10  something like that, but, no.   Yes, they are professional

11  wrestling moves.

12      Q.    Earlier you were speaking about elements of the

13  Ultimate Warrior character in the games, your allegations

14  that the character is in the game.   I would like to

15  explore that a little bit further.   Have you ever seen

16  your character in the games?

17      A.    Yes.

18      Q.    How have you seen your character -- have you

19  played the games?

20      A.    I don't play the games.   I have played the video

21  clips.

22      Q.    Video clips?

23      A.    The evidence that we have given you guys.

24            MS. GALSTON:   I am going to take a quick break.

25  Can we go off for five minutes?

Page 27

EXHIBIT A, page 18

1    three times -- I mean, I have never seen a Kung Fu movie

2    inside a ring.

3         Q.   So it has to be a wrestling move?

4         A.   Yes.

5         Q.   Okay.  We talked a lot about the moves.  One

6    thing you mentioned earlier was that THQ is infringing

7    your identity.  Can you describe that for me, if that is a

8    correct restatement of what you said?

9         A.   Well, if you take -- I mean, we are talking

10   about something when we say Ultimate Warrior.  There is

11   something we can point to visually to say that is Ultimate

12   Warrior.  That's what I mean by that identity.

13        Q.   What is that something?

14        A.   What is in the game.

15        Q.   Is it your name that is in the game, the

16   Ultimate Warrior?

17        A.   I think the Warrior is in there, and I own the

18   trademark on Warrior, too.

19        Q.   But could you answer my question?  Is the

20   Ultimate Warrior name in the game?

21        A.   I am not sure.

22        Q.   Have you ever seen the Ultimate Warrior name in

23   the game?

24        A.   You mean spelled out on the screen?

25        Q.   Yes.

Page 33

EXHIBIT A, page 19

1      A.    Ultimate Warrior spelled out on the screen?

2      Q.    Yes.

3      A.    I haven't seen that.  It may be in the video

4    clips or evidence we submitted.  I don't know.

5      Q.    Are you saying you would have to look at the

6    video clips or evidence you submitted?

7      A.    Um-hum.

8      Q.    But you don't have any other reason other than

9    what is in the video clips or evidence you've submitted to

10   think that the Ultimate Warrior name --

11     A.    When I look at the character in the game, if

12   somebody has asked me or if I want to use words and I want

13   to describe what that is or name it, I say Ultimate

14   Warrior, so --

15     Q.    But the game doesn't say Ultimate Warrior?

16     A.    Well, it does in the character.  It says it back

17   to the person playing it.

18     Q.    I don't understand.

19     A.    The identity is associated and inseparable from

20   Ultimate Warrior as a name as what you call it.

21     Q.    I understand now.  But the name, quote, Ultimate

22   Warrior, close quote, is not in the game?

23     A.    I don't know.  I am not sure.

24     Q.    Is the name Generation Warrior in the game?

25     A.    I don't know.

Page 34

EXHIBIT A, page 20

1     A.  I don't play the games.

2     Q.  So you don't know?

3     A.  Well, I know Ultimate Warrior is in there.

4     Q.  Is the Ultimate Warrior in there as a character

5  you can select or do you have to create the character?

6     A.  I think both ways.

7     Q.  Both ways.

8     A.  There are selections you have to make to create

9  him, so you do, in fact, select him.

10     Q.  Okay.  But the only way that you can play with

11  the Ultimate Warrior character is through the creation of

12  that character using the creation mode of the game?

13     A.  Well, Warrior is in there.  That is available in

14  there as a -- let's say -- let's call it a pure selection,

15  parts unknown is in there.

16     Q.  I'm sorry.  What do you mean by "Warrior is in

17  there"?  And are you referring -- when you say "Warrior is

18  in there," does that mean Warrior as a trademark or does

19  that mean a character called Warrior?  What do you mean by

20  Warrior is in there?

21     A.  As a name.  You can -- my understanding is that

22  you can select a name for the wrestler -- for a wrestler,

23  the Warrior, or Warrior maybe by itself.

24     Q.  You can select a name for any wrestler you

25  create, you can call him the Warrior; is that correct?

Page 36

EXHIBIT A, page 21

1    Down - Here Comes the Pain.  It has been marked THQ 12.

2              If we could mark that next in sequence.

3              MR. MAYNARD:  What year is that?

4              MS. GALSTON:  It is Smack Down - Here Comes the

5    Pain.

6              MR. MAYNARD:  And that is 12?

7              MS. GALSTON:  THQ 12.

8              MR. MAYNARD:  Well, I just want to make sure.

9    We've got Exhibits 1 and 2.  Is this Exhibit 12?

10             THE REPORTER:  3.

11             MR. MAYNARD:  Exhibit 3.

12             THE REPORTER:  That's the Bates number.

13             MR. MAYNARD:  Ah, okay.

14             (Deposition Exhibit No. 3 was marked for

15   identification by the reporter.)

16        Q.   BY MS. GALSTON:  Warrior, if you could review

17   this game box for Smack Down - Here Comes the Pain, is the

18   name "Ultimate Warrior" on the box?

19        A.   No.

20        Q.   Is the name "Warrior" on the box?

21        A.   I don't know.  In the small print you guys use,

22   is the word "Warrior" down there?

23        Q.   I think the small print is the --

24        A.   I can't really make it out, and I am too

25   stubborn to get glasses, so ...

BenchmarkDepo-The Deposition Services Company 310.556.0595

EXHIBIT A, page 22

1        Q.    When you say "the small print" --

2        A.    I would say no.

3        Q.    But in the pictures, there is some text, various

4    logos, do you see any of your intellectual property on

5    this game box?

6        A.    No.

7        Q.    I would like to produce Smack Down Versus Raw

8    which is another game that is referenced in your complaint

9    that we will mark Exhibit 4.

10            (Deposition Exhibit No. 4 was marked for

11    identification by the reporter.)

12        Q.    BY MS. GALSTON:   Would you take a look at this

13    box for Smack Down Versus Raw?   Is any of your

14    intellectual property on this package?

15        A.    No.

16        Q.    Have you seen or do you know of any packaging

17    for any THQ game that contains any of your intellectual

18    property?

19        A.    I haven't seen any.   I don't know that there

20    isn't, but I haven't seen any.

21        Q.    So you haven't seen any in the games that you

22    have reviewed?

23        A.    I haven't seen anything on any box that I have

24    seen.

25        Q.    What about any advertisements?   Are there any

1     also make for me limited edition figures --

2          Q.   Okay.

3          A.   -- which are highly collectible in the

4     collectible market.

5          Q.   So then you sell these figures yourself?

6          A.   Um-hum.   Yes.   Yes.

7               MS. GALSTON:   Dan, I don't think we received

8     other documents related to the JAKKS contract.

9               MR. MAYNARD:   I am sure you haven't.

10              MS. GALSTON:   Okay.   If you could look into that

11    also, I would appreciate it.

12              MR. MAYNARD:   What is it you think you are

13    entitled to -- we will talk about it off the record.

14              MS. GALSTON:   Okay.   We will talk about it

15    afterwards.

16         Q.   BY MS. GALSTON:   So other than the agreement

17    with the claim we just talked about as Exhibit 5 and this

18    license agreement with JAKKS and a previous license

19    agreement with JAKKS, have there been any other agreements

20    to license intellectual property associated with the

21    Ultimate Warrior that you have entered into?

22         A.   No.

23         Q.   No other agreements.

24              Have you ever licensed the moves to anyone?

25         A.   No.   It is a good idea.

1          MR. MAYNARD:  Objection to the form.

2          THE WITNESS:  No, I did.

3      Q.   BY MS. GALSTON:  Once you became the Ultimate

4  Warrior, did the character or the look of the Ultimate

5  Warrior change or evolve over time?

6      A.   He did throughout my whole career, even up to

7  1998.  I mean, I just kept reinvesting in my gimmick and

8  my character creatively and costume-wise.

9      Q.   Your character would be --

10     A.   The same look, the logo was always the same, the

11  face paint.  I had a palette of colors I would use.  The

12  outline of the logo was always the same, for the most

13  part.  I mean, not to the centimeter on my face.  It would

14  change sometimes.  Sometimes I would paint it on my cheek.

15  Sometimes it would be full paint.  Sometimes I would paint

16  it on my chest.  All different kinds of colors.  And then

17  the trunks and the boots and arm bands and the wrist bands

18  and all that stuff would be color coordinated, and then

19  eventually I got into graphic art.  I had a graphic art

20  guy that would paint dusters and the clothes -- images on

21  the clothes and stuff.

22     Q.   So the colors of the Ultimate Warrior would be

23  different each time you wrestled?

24     A.   Not every time.  I mean, I had a bunch of

25  different colors and outfits to choose from, yes.

Page 75

EXHIBIT A, page 25

1          Answer.

2          THE WITNESS:  None.

3     Q.   BY MS. GALSTON:  You referenced earlier a

4  lawsuit with Titan Sports.

5     A.   Yes.

6     Q.   Is this a lawsuit that was filed, I believe, in

7  1996?

8     A.   Yes.

9     Q.   Was there a settlement in this lawsuit?

10    A.   There was a settlement agreement signed.

11    Q.   I am going to introduce a complaint that was

12  filed in Ultimate Creations, Inc., v. McMahon.  It was

13  filed January 9, 2006.

14         (Deposition Exhibit No. 8 was marked for

15  identification by the reporter.)

16    Q.   BY MS. GALSTON:  Your company, Ultimate

17  Creations, Inc., filed this complaint in January '06,

18  Warrior; is that correct?

19    A.   Jeez, it has been that long.  Yes.

20    Q.   Attached as Exhibit 1 to this complaint is a

21  Reporter's Transcript of Proceedings?

22    A.   Yes.

23    Q.   And this was filed with the original complaint.

24         Is this what you are referencing as the

25  settlement agreement between Ultimate Creations and Titan

Page 82

EXHIBIT A, page 26

1    Sports, the settlement of the 1996 lawsuit?

2            MR. MAYNARD:  Objection to the form.

3            THE WITNESS:  Yes, this is what was signed.

4        Q.   BY MS. GALSTON:  Did you ever sign a formal

5    settlement document or is the entirety of the settlement

6    what was read on the record during these proceedings?

7            MR. MAYNARD:  Objection to the form.

8            THE WITNESS:  No.  My understanding, no.  I

9    mean, there were -- no.

10       Q.   BY MS. GALSTON:  Were there any drafts exchanged

11   between the parties of a formal settlement agreement?

12       A.   Yes.

13           MS. GALSTON:  Dan, I think we should add that to

14   the list as far as documents.  I think that is encompassed

15   in what we have asked.

16           MR. MAYNARD:  I think you are right.

17       Q.   BY MS. GALSTON:  Now, is it pursuant to this

18   agreement with Titan that you got the trademarks for the

19   Ultimate Warrior character?

20           MR. MAYNARD:  Objection to the form.

21           THE WITNESS:  Ask again, please.

22       Q.   BY MS. GALSTON:  Was it pursuant to this

23   agreement that you got the trademarks for the Ultimate

24   Warrior character from WWE or did you always own those

25   trademarks?

Page 83

EXHIBIT A, page 27

1   compensation to the plaintiffs or their successor.

2         This doesn't mean that WWE had rights in the

3   character, the Ultimate Warrior character?

4         A.   Right.  I mean, this is a rough that over the

5   next 30 days was supposed to be ironed out.  There is

6   correspondence that shows that there was something very

7   important here that needed to be clarified, and what Titan

8   or WWE has done since then is -- in not wanting to sign

9   off on a final settlement agreement, the final version of

10  one, is that they want to try to make the case.

11        Me, as the layperson I am, when I see

12  character -- and now taking into account the arguments

13  that WWE has made, they want to mean that it doesn't

14  mean -- yes, Ultimate Warrior in the copyright or film,

15  they can use the film footage, but the language isn't

16  right in this settlement agreement here to clarify it

17  distinctly as it needs to be understood in the way that I

18  understand it myself.

19        Q.   Were you present at these settlement

20  proceedings?

21        A.   Yes.

22        Q.   Is there a place in the transcript where you

23  disputed the statement I just read?

24        A.   The 30 days after this one on the record was the

25  time to work that out -- for the legal counsel to work

1    that out.

2         Q.    What is the answer to my question?  No?

3         A.    No, I didn't speak up that night.  No.

4         Q.    Did your lawyer dispute the accuracy of this

5    statement in the record?

6              MR. MAYNARD:  Objection to the form.

7         Q.    BY MS. GALSTON:  Did your lawyer make any --

8         A.    I don't recall.  I guess it would be on the

9    record if he did.

10        Q.    And you don't see here a place on the record

11   that he did?

12        A.    Right.

13             MS. GALSTON:  Dan, Warrior mentioned some

14   correspondence related to the agreement.

15             MR. MAYNARD:  Right.

16             MS. GALSTON:  Would you put that on the list?

17             MR. MAYNARD:  I did.

18             MS. GALSTON:  Thank you very much.

19        Q.    BY MS. GALSTON:  If I could direct your

20   attention just briefly back to the responses you gave for

21   requests for admission.

22        A.    What page is that on?

23        Q.    I think you have it right there.  Request for

24   admission 3 and request for admission 4 -- request for

25   admission 3 states:  Admit that the settlement agreement

Page 89

EXHIBIT A, page 29

1          A.    Well, you know, they always ask what they should

2     call me.  It is up to them.  Warrior.  I mean, I go by my

3     legal name.

4          Q.    Where do you make these public appearances?

5          A.    Colleges all over the countries.

6          Q.    Colleges?  What colleges?

7          A.    How many colleges do you need?

8          Q.    Can you --

9          A.    I have done 60 or 70 in the last couple of

10    years.

11         Q.    What do you mean "couple of years"?

12         A.    Going back 24 months.

13         Q.    So 60 or 70 colleges in the past two years --

14         A.    Two, three years.  Yeah, I would say.  It is

15    2007 now.  Make that three or four.  Probably in the last

16    couple of years, 60 or 70.  In the last four since I got

17    involved with some organizations out of Washington, D.C.,

18    maybe 100, 120.

19         Q.    When you go to colleges, what types of groups

20    enlist you to come?

21         A.    Kids that are interested in -- that are involved

22    in government organizations, kids that are paying

23    attention to what is going on in the world outside of the

24    school, already paying attention to serious ideas.  They

25    bring me in.  It's usually -- depending on a college, they

Page 103

1        A.    Oh, jeez, I can't remember.   There were people

2   that -- you know, guys would sometimes dress up at fairs

3   or something as the Ultimate Warrior, some big muscle guy

4   in the gym or something, and try to get away with it as

5   long as he could, I guess, and I found out about it.   Just

6   a couple instances like that.

7        Q.    What is the status of your action against the

8   WWE regarding the Self-Destruction video?

9        A.    Like every other client.   What the hell is going

10  on?  I don't know.  I mean, come on.  Is the client

11  supposed to know that?  Is the client supposed to have

12  that information?

13       Q.    It is not resolved, correct?

14       A.    No, not yet.  It's -- please.  I was blown away

15  by it.  It has been a year since we filed the complaint.

16       Q.    What is the Generation Warrior?

17       A.    I don't know.  I had spoken -- I mean, over the

18  last 10 years since I've had my site up, I mean, it went

19  through a redesign a few months ago, but there were -- I

20  would say going by the actual printer pages, there is 700,

21  800 pages of commentary on all kinds of different stuff.

22            You know, I am a father.  I got kids.  I pay

23  attention to what is going on outside in the world, in

24  culture.  I am outspoken about those things.  And my views

25  are not politically correct, and I write a lot about

Page 105

EXHIBIT A, page 31

1    everything.

2            And I had written a post -- or spoken to -- you

3    know, you call each generation of young kids generation X,

4    generation Y, generation this, and I had just thrown in my

5    opinion about the generation of kids, where kids are

6    today, the kind of culture they are growing up in, and I

7    may have used "Generation Warrior."

8        Q.   So it is not a wrestling character; it is -- the

9    Generation Warrior is tied to this work you have been

10   doing inspirational, motivational speaking?

11       A.   No, it is not a character, no.

12       Q.   It gets a little confusing with all the

13   warriors.

14       A.   Um-hum.

15            MR. MAYNARD:  That was a "yes"?

16            THE WITNESS:  Yes.

17       Q.   BY MS. GALSTON:  Speaking of warriors, were

18   there other warriors when you were wrestling in the WWE?

19       A.   Were there other what?

20       Q.   Warriors.  People with the name Warrior.

21       A.   When I was in WWE?  Well, there were the Road

22   Warrior characters.  They were a tag team.  They were

23   there for a while.  Nobody else in the WWE.

24       Q.   Are there other characters named Warrior

25   anywhere else other than the Road Warriors and the

Page 106

EXHIBIT A, page 32

1      Q.    I am a character in the game.  You can turn on

2   the game and play the game with me wrestling other people.

3   If I did the moves, would people -- would that infringe

4   your rights, if I did the moves?

5              MR. MAYNARD:  Objection to the form.

6              THE WITNESS:  As a player of the game, you turn

7   on the game?

8      Q.    BY MS. GALSTON:  I am in the game.

9      A.    Um-hum.

10     Q.    I am in the game, and I do the moves --

11     A.    What is your ring name?

12     Q.    My ring name is Kate Galston.  I am an attorney.

13  I am wearing a blue and white striped shirt and black

14  pants.

15     A.    In the game, like the -- the bodies that are

16  made up in the game, I mean, the pictures that have been

17  passed around here, yes.  I mean, if you were a wrestler,

18  if Kate was a wrestler and she was in this game because

19  somebody had hired you or used an identity -- I mean, you

20  wouldn't be in the game just as Kate, you would be in this

21  wrestling game because it is about wrestling, and so you

22  would be a wrestler.

23              And, yes, if you were a wrestler in the game

24  using those sequence of moves like that, even if they had

25  you in the video game looking like you do, then you would

Page 115

EXHIBIT A, page 33

1    be replicating signature moves of Ultimate Warrior.

2         Q.    Even though nobody would think I was the

3    Ultimate Warrior?

4         A.    They would say that is Ultimate Warrior

5    behavior.  It is like shaking the ropes.  I mean,

6    certainly -- you know, you are the one deposing me, but

7    you have seen the videos, and there is a shaking of the

8    ropes in there.  Nobody ever did that.

9         Now, they -- this Batista guy started doing it,

10   sort of coincidentally I guess about the time we filed the

11   lawsuit, but nobody ever did that.

12        You could take a 110-pound guy in the game in

13   the character or go to an arena where a ring is set up by

14   itself, fill it with a bunch of people in the arena and

15   get the janitor up there before the show starts and have

16   him standing outside the ring apron and shake the ropes,

17   people are going to say:  That's an Ultimate Warrior

18   thing.

19        Q.    People when you were performing in wrestling?

20        A.    Well, I mean, we are talking about wrestling.

21        Q.    Even now, you say people if they saw the janitor

22   get up and shake the ropes, they would think of you?

23        A.    Oh, yeah.  Oh, yes.

24        MS. GALSTON:  I think other than what we have

25   talked about with respect to the missing documents, Dan,

Page 116

EXHIBIT A, page 34

STATE OF ARIZONA          )
                         ) ss.
COUNTY OF MARICOPA        )

I HEREBY CERTIFY that the foregoing deposition was taken by me pursuant to Notice; that I was then and there a Certified Court Reporter for the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth and nothing but the truth; pursuant to request, notification was provided that the deposition is available for review and signature; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed through computer-aided transcription under my direction, and that the foregoing 117 typewritten pages contain a full, true, and accurate transcript of all proceedings had upon the taking of said deposition, all done to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any of the parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Phoenix, Arizona, this 22nd day of February, 2007.

Carrie Smatanskas, RPR, CR
Certified Reporter
Certificate No. 50355

**EXHIBIT B**

**CERTIFIED COPY**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

ULTIMATE CREATIONS, INC., etc.,    )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )  CASE NO.
                                   )  CV 2005-1134-PHX-SMM
THQ, INC., etc.,                   )
                                   )
                    Defendant.     )
_____)

DEPOSITION OF KATHY VRABECK

February 15, 2007

237682

**BARKLEY**
Court Reporters

(310) 207.8000   Los Angeles       (916) 922.5777   Sacramento      (818) 702.0202   San Fernando Valley
(949) 955.0400   Orange County     (408) 885.0550   San Jose        (858) 455.5444   San Diego
(415) 433.5777   San Francisco     (951) 686.0606   Inland Empire   (760) 322.2240   Palm Springs

EXHIBIT B, page 36

1    question, Mr. Maynard.

2         MR. MAYNARD:  Okay.  Okay.  I was just trying

3    to move things along.  I will stipulate that that's the

4    objection you would make.  I wouldn't stipulate that

5    those --

6         MS. GALSTON:  I'm not going to stipulate to it.

7    Q    BY MR. MAYNARD:  In doing your assignment, do

8    you have any understanding of -- strike that.

9         In B, you've placed, on page 5, "It is unlikely

10   that a game player would think that the Ultimate Warrior

11   is a part of these games, is associated with these games

12   or has endorsed these games in any way."  What is the

13   basis of that opinion?

14   A    Well, there's a lot that forms the basis to

15   that opinion.  Part of it is up in the previous section

16   of the report, where I talk about why people license

17   games, what people expect to see in the licensed games,

18   how licensed games are marketed.  And then part of that

19   basis comes from all the review of the materials and

20   certainly in reviewing the games themselves.

21        The superstars of wrestling or the characters

22   of wrestling are up front.  Their face is on the front

23   of the game, within the game.  When you choose either an

24   exhibition or a season mode, you have a list of

25   characters that have names.  When you choose the name,

EXHIBIT B, page 37

KATHY VRABECK

BARKLEY
Court Reporters

```
 1    their picture comes up; information about that character
 2    comes up.  There are numbers of sort of stars that are
 3    associated both in the game and in the marketing of the
 4    game.  There are real-life personalities that are used
 5    in the marketing of the game.
 6           And given that it seems a real stretch, in my
 7    mind, when you don't see the Ultimate Warrior in the
 8    game or in any of the marketing of the game, that a real
 9    consumer would believe that he's in any way part of
10    these games.
11        Q    Did you do anything to test that theory by
12    going on the Internet to see if in any blogs there were
13    wrestling gamers who believe that you could create the
14    Ultimate Warrior?
15        A    You know, all I have reviewed is what's listed,
16    either as attached to the document or the one statement
17    up front where I said I Googled the image of the Warrior
18    and read the two game reviews on IGN.com.  I did not do
19    any other research around this game on the Internet or
20    otherwise.
21        Q    So you don't know if gamers are blogging,
22    saying, "I have created the Ultimate Warrior," or not?
23        A    Only in --
24        Q    Other than what you've seen here?
25        A    Only in what I have -- was produced for
```

EXHIBIT B, page 38

66

KATHY VRABECK

BARKLEY
Court Reporters

1    the Tiger Woods' logo?

2         Q    BY MR. MAYNARD:   Let's assume.

3         A    Assuming Tiger Woods has a logo --

4         Q    He has a logo that he wears on his hat in every

5    match that he plays in these days that has been created

6    by Nike or was created by himself and he markets

7    clothing on it.  Let's assume that.  Okay?

8             If Activision were going to use that in their

9    characters, would they -- do you think they'd pay a

10   licensing fee for it?

11        A    I don't know if there would be a licensing fee

12   paid for the Tiger Woods logo --

13        Q    Okay.

14        A    -- for use as the exact logo in a game.

15        Q    You go on to say "With similar effort there are

16   an infinite number of characters that can be created,

17   from Kobe Bryant to Britney Spears."  Did you attempt to

18   create the Kobe Bryant character?

19        A    I did not personally try to create Kobe Bryant

20   in this game.  I did play around with the create a

21   character to try and create unusual characters.  But I

22   did not try to create a real-life individual in this

23   game.

24        Q    So do you know whether or not you could create

25   somebody that looks like Kobe Bryant in the game?

EXHIBIT B, page 39

KATHY VRABECK

BARKLEY
Court Reporters

1     A    Given all of the variables that are available

2  to you in the game -- and I don't know if you've gone

3  into create a character -- but you can choose a face,

4  and then you have the option to choose the X-Y axis to

5  model anyone's face.  So given that, yes, you could

6  create a character that some people would believe

7  resembles Kobe Bryant.

8     Q    You go on to state farther down in the

9  paragraph, "I was given, as part of the case materials,

10  a printout of an online posting where someone had

11  described in great detail, one way to create the

12  Ultimate Warrior in the WWE SmackDown! game."

13         Okay.  And did you actually try to create the

14  character yourself, given these instructions?

15     A    I did.

16     Q    Did it resemble the Ultimate Warrior?

17         MS. GALSTON:  Objection.  Outside the scope of

18  the qualifications.

19         THE WITNESS:  You know, in doing that, I was

20  testing the length of time that it would take me to

21  create what this person said resembled the Ultimate

22  Warrior.  Again, having not seen a video or Warrior --

23  I've only seen a small postage size stamp -- I'm not

24  sure I was qualified to say that this ultimately

25  resembled him.

EXHIBIT B, page 40

KATHY VRABECK

BARKLEY
Court Reporters

1      Q   Okay.  Did you ever try to build an Ultimate

2   Warrior character in any of the other games?

3      A   No, I did not.

4      Q   When you say, in your first opinion, that the

5   Ultimate Warrior -- in your opinion that the Ultimate

6   Warrior character is not in any of the games, is that

7   because you can't find him already built in any of the

8   other games?

9      A   That's because he's not in those games already

10   built nor are the components -- you can't go through a

11   list and simply choose the Warrior face, Warrior chest,

12   Warrior arms.  The create-a-character section is very,

13   very detailed.  Once you do choose a shape of a head,

14   you then go in and alter that.  So of the hundreds of

15   possible shapes, you choose one and then further refine

16   it with the tools as described by this one report that

17   goes into detail when it says, "Left bicep," and then

18   shows X-Y coordinates.  You actually choose one of many

19   biceps, then you further alter it.

20        So given the amount of steps it took, even this

21   individual, to create it and that the component parts of

22   Warrior are not in the game, either named or unnamed

23   Warrior, that's the basis of my saying he's not in the

24   game.

25      Q   Well, is it your belief, based upon the

EXHIBIT B, page 41

73

KATHY VRABECK

**BARKLEY**
Court Reporters

1    technology that is in the create a character, that if

2    one wanted to, they could create a character that looks

3    like my client Warrior?

4            MS. GALSTON:   Objection.  Asked and answered.

5            THE WITNESS:   So based on the technology that's

6    in the game, you could create any character, any person.

7        Q    BY MR. MAYNARD:   Including my client?

8        A    Including, but certainly not limited, to your

9    client.

10       Q    Okay.  The next paragraph you go, "However,

11   this could take significant hours or days and is not the

12   objective of the WWE games."  You underscored that.  Do

13   you see that?

14       A    Yes, I do.

15       Q    The objective of the game is to win the belt;

16   correct?

17       A    The objective of the game is actually to

18   recreate the season of the WWE.  So my understanding is

19   that, you know, in a WWE -- in the year there are a

20   series of story lines, and there are certain characters

21   who win or lose.  And gamers buy these games to be able

22   to play as those characters and to be able to recreate

23   the season.

24       Q    If they wanted to recreate a season, say, from

25   1995, can they do that?

EXHIBIT B, page 42

74

KATHY VRABECK

BARKLEY
Court Reporters

1    number.  No entrance animations were listed by names."

2           Now, at some point you became aware that in

3    some of the games, the entrance animations were listed

4    by wrestler; correct?

5           MS. GALSTON:  Objection.  Vague and ambiguous.

6    Q    BY MR. MAYNARD:  I'm looking two paragraphs

7    down.

8           MS. GALSTON:  I'm sorry?

9           THE WITNESS:  Where are you?

10   Q    BY MR. MAYNARD:  Two paragraphs down from what

11   I was reading.

12   A    Two paragraphs down does not refer to entrance

13   animation.  It refers to move set.

14   Q    Did you ever find entrance animations?

15   A    Yes.  In the paragraph that you mentioned, I

16   say here:  "I found 74 entrance animations that were

17   available to add to your character, but all of these

18   animations are listed by number, no names."

19          WARRIOR:  Page 7, bottom.

20          MR. MAYNARD:  No.  No.  I'm looking for

21   something else.

22   Q    So when you say, "It was impossible to

23   determine if any of these 74 unlockable entrances are

24   fashioned after real-life wrestlers from reviewing the

25   list of numbers" -- do you see that?

**EXHIBIT B, page 43**

82

BARKLEY
Court Reporters

1    A    I do.

2    Q    That's because you're not familiar with the

3  entrances of wrestlers from the WWE; is that correct?

4    A    No.  That's actually not what I -- not what I

5  mean here in this sentence.  It's impossible because,

6  again, once you've completed the game, so that you can

7  unlock these things -- which far and away the majority

8  of consumers do not get that far, and do not actually

9  beat the game -- but if you have and have unlocked

10  entrance animations, when you go in to pick an entrance

11  animation, it simply has a number.  It says "1."  It

12  doesn't say what that is.  It doesn't say if that means

13  you enter doing somersaults or cartwheels or if you

14  enter walking backwards.  It just says "1," and the next

15  one says "2."  And there's no descriptor.  That's

16  impossible to determine if any of these 74 unlockable

17  entrances were fashioned after a real-life wrestler

18  because there's no notation other than a number.

19    Q    It's impossible for you.  Did you follow

20  wrestling?

21         MS. GALSTON:  Objection.  Asked and answered.

22         THE WITNESS:  Again, they just have a number.

23  They don't say -- they don't even show what they are.

24  So it would be impossible for anyone to look at this

25  list and say that any of these are associated with

EXHIBIT B, page 44

83

KATHY VRABECK

BARKLEY
Court Reporters

1    anybody.  It's simply numbers.

2        Q    BY MR. MAYNARD:  Okay.  Let's make sure that

3    the record is clear.  When I get to this part where I've

4    got 74 unlockable entrances, I can take a character up

5    there and press "1," and that character will enter in a

6    certain manner.  Correct?

7            MS. GALSTON:  Objection.  Vague and ambiguous.

8            THE WITNESS:  Once you -- in this example, once

9    you choose an animation, you would then have to go

10   complete the -- anything else you're going to add to the

11   character, go back, use your character, choose a match,

12   choose an opponent, and then see the entrance animation

13   to determine what makes up the entrance animation.

14       Q    BY MR. MAYNARD:  But is it your understanding

15   each one of those 74 entrances are different?

16       A    Yes, that's my understanding.

17       Q    You didn't go through and look at each one of

18   the 74 entrances with a character to see what they did

19   in those entrances?

20           MS. GALSTON:  Objection.  Outside the scope.

21       Q    BY MR. MAYNARD:  Correct?

22       A    That is correct.  I did not go through and look

23   at each one.

24       Q    So you don't know exactly what the difference

25   is between entrance animation 1 versus 74?

EXHIBIT B, page 45

KATHY VRABECK

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF   Los Angeles      )

     I, M. Susan Edwards          , hereby certify:

     I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 13051 issued by the Court Reporters Board of California and which is in full force and effect.  (Fed. R. Civ. P. 28(a).)

     I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me.  (Fed. R. Civ. P. 28(a), 30(f)(1).)

     I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action.  (Fed. R. Civ. P. 28.)

     I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

EXHIBIT B, page 46

133

BARKLEY
Court Reporters

1  of the testimony given by the witness.   (Fed. R. Civ. P.

2  30(f)(1).)

3        Before completion of the deposition, review of

4  the transcript [xx] was [ ] was not requested.   If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.   (Fed. R. Civ. P. 30(e).)

8  Dated:  March 5 _____ ,  2007

9

10                        _M̲m̲E̲d̲u̲S̲.̲_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT B, page 47

BARKLEY
Court Reporters

**EXHIBIT C**

Int. Cl.: 41

Prior U.S. Cls.: 100, 101, and 107

Reg. No. 2,345,959

**United States Patent and Trademark Office**   Registered Apr. 25, 2000

## SERVICE MARK
### PRINCIPAL REGISTER



ULTIMATE CREATIONS, INC. (ARIZONA CORPORATION)
8711 EAST PINNACLE PEAK ROAD #185
SCOTTSDALE, AZ 85255

FOR: ENTERTAINMENT SERVICES, NAMELY, TELEVISION PROGRAMMING IN THE NATURE OF LIVE AND ANIMATED AD-

VENTURES FOR CHILDREN, IN CLASS 41 (U.S. CLS. 100, 101 AND 107).
FIRST USE 6-1-1986; IN COMMERCE 6-1-1986.

SN 75-367,947, FILED 10-3-1997.

SHAUNIA WALLACE, EXAMINING ATTORNEY

EXHIBIT 1
Witness _whesiof_
Date _2.15.01_
Carrie Smalanskas, RPR

UCI 000006

EXHIBIT C, page 48

**EXHIBIT D**



IGN.com | PC Games | PS2 | PS3 | PSP | Xbox | Xbox 360 | GameCube | DS | Game Boy | Wireless | FilePlanet | Cheats | Movies | DVD | Music | Com

Log In | Register
My Account | My Email Alerts
My Collection (0 Games) | My Wishlist

Enter Game Title

**Find Game**

It's Good to Be a PC Gamer
Check out all these huge, new
games! And we've got detailed
reviews for all of them:


Call of Duty 2


Age of Empires III


F.E.A.R.


Quake 4

**SECTIONS**

· Football
· Basketball
· Baseball
· Boxing
· Hockey
· Wrestling
· Other
· Play of the Day
· News
· Mailbag
· Message Boards

**CHANNELS**

**Insider Members**
· Insider Channel
· Hi-Res Movies
· Strategy Guides
· Join Insider

**Games**
· PC Games
· PlayStation 2
· PlayStation 3
· Sony PSP
· Xbox
· Xbox 360
· GameCube
· Nintendo DS
· Game Boy
· Wireless
· N-Gage
· PlayStation
· N64
· Dreamcast
· PC Downloads
· Top Games
· VE3D
· Vault Network

**Entertainment**
· Movies
· DVD
· Music

IGN » Sports » Wrestling

# WWE Smackdown: Here Come the CAWs
**How to create the Ultimate Warrior, Razor Ramon and more.**
by IGN Sports

**November 21, 2003** - The perfect wrestling game would have every wrestler you've ever loved to see work in the ring, from legends like Terry Funk and Ricky Steamboat to newer stars like Y2J and AJ Styles. Well, since nobody will ever have a game with all of those licenses, the next best thing is to create these starts yourself.

Thanks to the readers of IGN Sports, now you have this opportunity.

Read below to find the menus and formulas to create a variety of past and present stars, then click on the media page to watch a few videos of the wrestlers smacking each other upside the head just like the good old days.

## The Ultimate Warrior

*Contributed by Slavetothemedia*

Figure
Body Morph: 0, 100

Form
Head: -25, -27
Neck: 43, 50 -38
Chest: 45, 0 -43
Shoulder: -27, 65 16
Abdomen: 32, -2 -10
Arms: 39, -7 -5, 2
Forearms: -12, -6
Hands: 24, 3 -71
Waist: 2, 0
Thigh: 18, 10
Legs: 0, -15 -13
Feet: -29, -7
Height: 6'2"

Body
Face: 14, 10, (0,0), (0,0), -51
Head: 0,0
Eyebrow: 0,0
Eyes: 0,0 0,0
Nose: 0,0 0,0
Cheek: 0,0
Mouth: 3,40 43
Jaw: -10,0 -12
Skin: 41 Color: -92, -18 Shade: 2
Hair: 35 Color: -85, 9 Shade: 0 Length: 72
Eyebrow: 1 Color: -94, 9
Eyes: 1 Color: 9, 9 Shade: 0
Facial Hair: N/A
Lips: 1

UCI 000016

let's all dis
wednes

extreme engineering
8pm cp

▼ rollo

- Comics
- Gear
- Sports
- Cars
- Babes
- Sci-Fi Brain

**Cheats & Codes**

- PS2 Cheats
- Xbox Cheats
- Cube Cheats
- PC Cheats
- GBA Cheats
- Top Cheats
- FAQs
- Game Guides

**IGN Services**

- Message Boards
- User Pages
- My Collection
- My Wishlist
- Newswire
- Free Email
- Newsletter
- Chat
- My Account

**GET GAMES**

**Direct2Drive**
**Compare Prices**
- PS2 Games
- Xbox Games
- Cube Games
- PC Games
- GBA Games

**PARTNERS**

- Dream Crib
- Full Sail Career Channel

7) Underwear: 1, 1 Color: 26, -24 Shade: -5

8) Head Paint: 30 Color: 26, -24 Shade: -5 Opac: 100
9) Head Paint: 33 Color: 26, -24 Shade: -5 Opac: 100
10) Head Paint: 31 Color: 100, 27 Shade: 11 Opac: 100
11) Head Paint: 32 Color: -73, 9 Shade: 0 Opac: 100

12) Simple (Body): 25 Turn: 2x Reduce: 2x Color: -81, 36 Shade: 0 Opac: 100
13) Simple (Body): 25 Turn: 2x Reduce: 2x Color: 9, 44 Shade: 0 Opac: 100
14) Simple (Body): 25 Turn: 2x Reduce: 2x Color: 9, 44 Shade: 0 Opac: 100
15) Simple (Body): 25 turn: 2x Reduce: 2x Color: -66, 41 Shade: 0 Opac: 100
16) Simple (Body): 25 Turn: 2x Reduce: 2x Color: -66, 41 Shade: 0 Opac: 100
17) Simple (Body): 25 Turn: 2x Reduce: 3x Color: -81, 36 Shade: 0 Opac: 100



18) WristBand (Both): 4, 1 Color: 26, -24 Shade: -5 Trans: 100 Length: 63
19) WristBand (Both); 9, 1 Color: -85, 33 Shade: 0 Trans: 100 Length: 64

20) Shoes: 13, 1, 7 Color: -93, -9

21) Knee Pads (Both): 14, 1 Color: 26, -24 Shade: -5 Opac: 100

22) Simple (Left Leg): 25 Turn: 2x Reduce: 3x Color: -67, 40 Shade: 0 Opac: 100
23) Simple (Left Leg): 25 Turn: 2x Reduce: 2x Color: -85, 32 Shade: 0 Opac: 100
24) Simple (Right Leg): 25 Turn: 2x Reduce: 3x Color: -67, 40 Shade: 0 Opac: 100
25) Simple (Right Leg): 25 Turn: 2x Reduce: 2x Color: -85, 32 Shade: 0 Opac: 100

26) Simple (Right Arm): 145 Turn: 2x Reduce: 0x Color: 28, 37 Shade: 0 Opac: 100
27) Simple (Right Arm): 145 Turn: 2x Reduce: 0x Color: 28, 37 Shade: 0 Opac: 100
28) Simple (Left Arm): 145 Turn: 2x Reduce: 0x Color: 28, 37 Shade: 0 Opac: 100
29) Simple (Left Arm): 145 Turn: 2x Reduce: 0x Color: 28, 37 Shade: 0 Opac: 100

Layers: 8-10 Warrior Face-Paint
12-17 Warrior Emblems on Trunks
18-19 Wrist Bands
20 Shoes
21 Knee Pads
22-25 Warrior Emblem Knee Pads
26-29 Bicep Ties

UCI 000017

**EXHIBIT E**

MICHAEL K. JEANES
Clerk of the Superior Court

By MARK LEONG, Deputy
Date 01/09/2006 Time 05:12 PM
Description        Qty      Amount
-------- CASE# CV2006-000364 --------
CIVIL NEW COMPLAINT  001     245.00

TOTAL AMOUNT              245.00
     Receipt# 00007592639

1  Daniel D. Maynard, No. 009211
   Michael D. Curran, No. 012677
2  **MAYNARD CRONIN ERICKSON**
   **CURRAN & SPARKS, P.L.C.**
3  1800 Great American Tower
   3200 North Central Avenue
4  Phoenix, Arizona 85012
   (602) 279-8500
5
6  Attorneys for Plaintiff
7          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
8             **IN AND FOR THE COUNTY OF MARICOPA**
9  Ultimate Creations, Inc., an Arizona
   corporation, Warrior and Dana Warrior,        CV2006-000364
10 husband and wife,
11                      Plaintiffs,              **COMPLAINT**
   v.
12
   Vincent K. McMahon and Linda
13 McMahon, husband and wife; Titan
   Sports, Inc., a Connecticut corporation,
14 World Wrestling Entertainment, a
   Connecticut corporation,
15
                        Defendant.
16
17      Plaintiffs, Ultimate Creations, Inc. ("Ultimate Creations"), Warrior and Dana Warrior
18 (hereinafter collectively "Warrior") for their complaint against Defendants, Vincent K.
19 McMahon and Linda McMahon, husband and wife ("McMahon"), Titan Sports, Inc., and
20 World Wrestling Entertainment, Inc. (hereinafter referred to jointly as "Defendants") alleges
21 as follows:
22              **PARTIES, JURISDICTION, AND VENUE**
23      1.     At all times material to this lawsuit, Ultimate Creations is an Arizona corporation
24 organized and existing under the laws of the State of Arizona and doing business in Maricopa
25 County, Arizona and was a party to a prior lawsuit filed in this court captioned *Warrior &*
26 *Ultimate Creations, Inc. v. Titan Sports, Inc., et al.*, CV96-15377 ("Arizona lawsuit") and was
   a party to a Settlement Agreement and Mutual Release entered into as of March 3, 2000 in the

MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.
3200 NORTH CENTRAL AVENUE • SUITE 1800 • PHOENIX, ARIZONA 85012
TELEPHONE (602) 279.8500 • FACSIMILE (602) 265.8185

EXHIBIT ___8___
Witness ___Warrior___
Date ___2·13·07___
Carrie Smalanskas, RPR

EXHIBIT E, page 51

1   Arizona lawsuit ("Agreement") attached as Exhibit 1.  It is the owner of certain intellectual

2   property, including but not limited to federally registered trademarks, service marks, trade

3   dress and common law trademarks and service marks associated with the wrestling character,

4   the Ultimate Warrior (referred to jointly hereinafter as "intellectual property").

5        2.     Warrior and Dana Warrior are husband and wife and at all times material to this

6   lawsuit, are residents of the State of New Mexico and were parties to the Arizona lawsuit and

7   were parties to the Agreement.

8        3.     Upon information and belief, at all times pertinent to this lawsuit, Defendants

9   Vincent K. McMahon and Linda McMahon are husband and wife and at all times material to

10  this lawsuit, are residents of the State of Connecticut and were parties to the Arizona lawsuit

11  and were parties to the Agreement.

12       4.     Titan Sports, Inc. is a Connecticut corporation organized and existing under the

13  laws of the state of Connecticut and doing business in Maricopa County, Arizona and was a

14  party to the Arizona lawsuit and the Agreement.

15       5.     Upon information and belief, at all times material to this lawsuit, World

16  Wrestling Entertainment, Inc. is the successor entity to World Wrestling Federation, Inc. which

17  was a party to the Arizona lawsuit and the Agreement.

18       6.     This Court has jurisdiction pursuant to Article 6, Section 14 of the Arizona

19  Constitution, A.R.S. §12-1323, and Agreement.

20       7.     Venue is proper in this Court pursuant to A.R.S. §12-401.

21                          **GENERAL ALLEGATIONS**

22       8.     On or about March 3, 2000, Ultimate Creations and Warrior entered into an

23  Agreement with Defendants.

24       9.     The Agreement settled two lawsuits between the Parties, one in the Superior

25  Court of the State of Arizona in and for the County of Maricopa, Cause No. CV96-15377 and

26  a separate action captioned Titan Sports, Inc. v. James Hellwig a/k/a Warrior and Ultimate

-2-

EXHIBIT E, page 52

1  Creations, Inc. in the United States District Court for the District of Connecticut, Civil Action

2  No. 398 CV 00467 (EBB)(the "Connecticut lawsuit").

3       10.    The Parties agreed that the Superior Court of the State of Arizona in and for the

4  County of Maricopa shall retain jurisdiction over any and all claims, disputes or controversies

5  arising from and in connection with or in any way relating to the enforcement, interpretation

6  or adjudication of the Parties' obligations hereunder and such Court shall be the sole forum

7  in which any disputes may be heard.  (Ex. 1, pp. 4, 9)

8       11.    The Agreement was to be confidential and the Parties agreed not to disparage

9  one another at any time in any place in any media. (Ex. 1, pp. 5, 8)

10       12.    The Parties agreed that Titan was the owner of certain copyrighted works that

11  depicted the Ultimate Warrior character and had all rights to exploit those copyrighted works

12  in any and all media. (Ex. 1, p. 12)

13       13.    The Parties agreed that Warrior had the right to perform the Ultimate Warrior

14  character in the future in any and all manner. (Ex. 1, p. 12)

15       14.    The Agreement provided that Warrior owns the trademarks and service marks

16  to Ultimate Warrior and Warrior characters.   Notwithstanding the foregoing, Warrior

17  acknowledged and agreed that Titan shall continue to have the right of fair use afforded it as

18  a result of its ownership of its copyrighted works.

19       15.    The Parties agreed that Warrior has the right to make his own copyrighted works

20  depicting the Ultimate Warrior and Warrior characters or to authorize others to do so.

21       16.    Titan agreed that Warrior has worldwide rights to the trademarks and service

22  marks concerning the Ultimate Warrior and Warrior characters. (Ex. 1, p. 14)

23       17.    Pursuant to the Agreement, the Parties agree neither they nor their agents,

24  servants, employees or representatives and those persons in active concert or participation with

25  the Parties and those persons under their direction or control shall not make, publish,

26  broadcast, air, print or distribute any comments, statements, or suggestions (written, verbal or

- 3 -

1  otherwise), directly or indirectly, that would disparage, defame, criticize, injury or harm the

2  reputation of any other Party.

3       18.    Upon information and belief, on or about August 2005, the Defendants made and

4  released a DVD entitled The Self-Destruction of the Ultimate Warrior (hereinafter referred to

5  as the DVD).

6       19.    The wrongful conduct of the Defendants in making, marketing and selling the

7  DVD was motivated by spite or ill will.

8       20.    The Defendants acted to serve their own interests, having reason to know and

9  disregarding a substantial risk that their conduct might significantly injure the rights of

10  Ultimate Creations and Warrior.

11       21.    The DVD is outrageous in that it disparages, defames, criticizes, injures, and

12  harms the reputation of Warrior and Ultimate Creations.

13  **First Claim For Relief**

14  **(Breach of Contract)**

15       22.    Ultimate Creations and Warrior incorporate the allegations set forth in

16  paragraphs 1 through 21 of the Complaint as if fully set forth herein.

17       23.    Defendants are in breach of the Agreement for the following reasons:

18       A)    the Agreement was to protect Warrior and Ultimate Creations from having

19  their reputations disparaged, defamed, criticized, injured or harmed by the Defendants. Upon

20  review of the footage of the DVD, it is clear that the negative footage was intended to harm

21  the reputation of Warrior and to devalue or injure the value of the intellectual property owned

22  by Ultimate Creations and Warrior and has caused such injury.

23       24.    As a result of Defendants' breach of the Agreement, Ultimate Creations and

24  Warrior have been damaged in an amount to be determined at trial together with attorney's

25  fees, costs and expenses.

26

- 4 -

EXHIBIT E, page 54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*Second Claim For Relief*

**(Defamation)**

25.   Ultimate Creations and Warrior incorporate the allegations set forth in paragraphs 1 through 24 of the Complaint as if fully set forth herein.

26.   The Defendants published the DVD knowing it contained false material, including the title intending to bring Warrior and Ultimate Creations into disrepute, contempt or ridicule, or intending to impeach Warrior's honesty, integrity, virtue or reputation.

27.   As a result of the publication of the DVD, the reputation of Warrior and Ultimate Creations has been damaged in an amount to be determined at trial.

*Third Claim For Relief*

**(Defamation)**

28.   Ultimate Creations and Warrior incorporate the allegations set forth in paragraphs 1 through 27 of the Complaint as if fully set forth herein.

29.   The Defendants published the DVD with knowledge of the falsity or reckless disregard for the truth and it placed Warrior in a false light highly offensive to a reasonable person.

30.   The DVD contains major misrepresentations of Warrior's character, history, activities or beliefs.

31.   Warrior has suffered emotional distress from the publication of the DVD.

**Fourth Claim For Relief**

**(Declaratory Judgment Action)**

32.   Ultimate Creations and Warrior incorporate the allegations set forth in paragraphs 1 through 31 of the Complaint as if fully set forth herein.

33.   The intent of the Agreement was that the Defendants had the right to use their copyrighted works that contained the Ultimate Warrior character in any manner that did not disparage Warrior or the intellectual property owned by Ultimate Creations.

- 5 -

34.   The Agreement provides that Warrior owns the worldwide rights to the service marks and trademarks associated with Ultimate Warrior and Warrior characters and that Titan had no claims in the marks other than it had the right to fair use of its copyrighted materials that contained the character.

WHEREFORE, Plaintiffs pray that judgment be enter in their favor and against the Defendants jointly and severally for each claim for relief as follows:

A.   For damages in an amount to be determined at trial;

B.   For an award of punitive damages in an amount to be determined at trial;

C.   For costs and attorneys' fees as allowed by law;

D.   For pre-judgment and post-judgment interest as allowed by law;

E.   For judgment that all footage, notes, films, disks, tapes and all materials produced in this project that resulted in the DVD be turned over to Ultimate Creations and Warrior and Defendants not keep or distribute any copies;

F.   For a judgment that Warrior and Ultimate Creations owns all the trademarks and service marks associated with the Ultimate Warrior and Warrior character; and

G.   For any further relief the Court deems just and proper under the circumstances.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial on all appropriate issues.

- 6 -

DATED this __9th__ day of January, 2006.

MAYNARD MURRAY CRONIN
ERICKSON & CURRAN, P.L.C.

By _Daniel D. Maynard_
Daniel D. Maynard
Jennifer A. Sparks
1800 Great American Tower
3200 Central Avenue
Phoenix, Arizona 85012
Attorneys for Plaintiffs

- 7 -

# EXHIBIT 1

1           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

2              IN AND FOR THE COUNTY OF MARICOPA

3

4   WARRIOR & ULTIMATE CREATIONS, )
    INC.,                         )
5                                 )
                   Plaintiffs,    )
6                                 )
        vs.                       )        CV 96-15377
7                                 )
    TITAN SPORTS, INC., ET AL,    )
8                                 )
                   Defendants.    )
9   _____)

10

11

12                   Phoenix, Arizona
                     March 3, 2000

13

14       BEFORE:   THE HONORABLE STEVEN D. SHELDON
                   Superior Court Judge

15

16

17

18           REPORTER'S TRANSCRIPT OF PROCEEDINGS

19           CONFIDENTIAL SETTLEMENT AGREEMENT

20

21

22

23

24   COPY                         HELENE PAUSTIAN, RPR
                                  Official Court Reporter
25

              SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 59

2

```
 1              A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3              HEBERT SCHENK & JOHNSEN
         BY:    SHAWN K. AIKEN
 4              Attorney at Law

 5              HART, BAXLEY, DANIELS & HOLTON
         BY:    JOSEPH T. MURRAY
 6              Attorney at Law

 7     FOR THE DEFENDANTS:

 8              KIRKPATRICK & LOCKHART LLP
         BY:    JERRY S. MCDEVITT
 9              Attorney at Law

10              ALVAREZ & GILBERT
         BY:    JOHN T. GILBERT
11              Attorney at Law

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 60

3

```
 1                              Phoenix, Arizona
                                March 3, 2000
 2

 3              (The following proceedings took place in open

 4      court:)

 5              THE COURT:  We are on the record, proceeding in the

 6      matter of Warrior versus Titan Sports, Inc.  And it's my

 7      understanding that a settlement has been reached.  Is that

 8      correct?

 9              MR. AIKEN:  Your Honor, Shawn Aiken for plaintiff,

10      and that's correct.

11              MR. MCDEVITT:  Jerry McDevitt for defendant.  We

12      believe that to be correct.

13              THE COURT:  All right.  I will simply note for the

14      record it's my understanding that this is a confidential

15      settlement agreement.  I will request that the transcript

16      of this proceeding be sealed at the conclusion of this

17      proceeding and that it not be opened without the

18      permission of the Superior Court.

19              And Mr. Aiken, if you would like to state

20      for the record what your belief is as to the terms of the

21      settlement agreement.

22              MR. AIKEN:  I will attempt to do that, your Honor,

23      and then ask for Mr. Murray's assistance, if appropriate,

24      and then followed I'm sure by Mr. McDevitt.

25              The parties agree that Titan Sports shall
```

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 61

4

1   pay $800,000 and then $90,000, in a way that I will

2   describe in just a moment, to Ultimate Creations, Inc.

3           Titan Sports within 30 days shall pay

4   $800,000 to Ultimate Creations, Inc.  Titan Sports then

5   within 30 days shall pay $90,000 to the clerk of the

6   Superior Court to be held in an interest bearing account.

7   The interest shall accrue to plaintiff's favor.

8           If, on March 15th, 2001, plaintiff's have

9   complied with the confidentiality provision that I will

10  describe in just a moment -- April 3rd then, 2001 -- the

11  clerk shall be directed by the Court to turn over the

12  balance of the account to plaintiff, Ultimate Creations,

13  Inc.

14          The Court, your Honor, shall retain

15  jurisdiction to hear any application by Titan Sports that

16  plaintiffs have allegedly briefed the confidentiality

17  provision.  Upon application, the Court will take

18  evidence, and only upon proof of a breach of

19  confidentiality provision directly attributable to

20  plaintiff shall the Court declare a breach of the

21  confidentiality provision.

22          If, and only if, there is a breach shall

23  there then be a forfeiture of the funds held in the

24  account.  I think I already stated assuming compliance

25  with the provision.  Then on April 3rd, 2001, the amount

SUPERIOR COURT - MARICOPA COUNTY

5.

1   in the account, as I say, shall be turned over to

2   plaintiff.

3              The confidentiality agreement encompasses

4   the terms of the settlement agreement.

5              In addition to the $890,000 that I just

6   described, Titan Sports, Inc., agrees that the Warrior

7   inventory on hand, as is, where is, shall be turned over

8   to plaintiff or plaintiff's designee.  These products are

9   as the parties can best determine today described in trial

10  Exhibit 584 and on document, Bates labeled, TJH02521.

11             The parties further agree they shall not

12  disparage one another in television, newspaper or the

13  internet.

14             The disposition on the pending cases between

15  these parties is the next topic.  The parties agree upon

16  payment of the $890,000, and that is as to the $90,000

17  upon deposit into the clerk's interest bearing account,

18  then this action and the action between the parties

19  pending in US Federal District Court for the District of

20  Connecticut shall be dismissed with prejudice.  Each party

21  to bear their own fees and costs.

22             The parties further agree that upon payment

23  of the amount I just described, $890,000, they shall

24  release one another from all claims whether known or

25  unknown, except as to the obligations otherwise described

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 63

1   in the agreement.   The intention there is that there be

2   mutual releases in a conventional sense.   But, of course,

3   obligations we are describing here in the agreement shall

4   remain in force.

5          The timing on the turnover of merchandise

6   I'm going to leave to Mr. McDevitt.   It's a detail we

7   haven't discussed.

8          Those are the deal points, your Honor.   The

9   further agreement, with counsel's consent, is that the

10  lawyers, although we are reciting an enforceable agreement

11  here on the record tonight, will see immediately to the

12  drafting of a more formal document and undertake to do

13  that within the next few days.   Thank you.

14      THE COURT:   My understanding is that the

15  preparation of the written document is not intended to

16  delay the enforceability of what is being placed on the

17  record today.   Is that correct?

18      MR. AIKEN:   That's correct.

19      THE COURT:   Okay.   Mr. McDevitt.

20      MR. MCDEVITT:   Your Honor, just a few points on

21  Mr. Aiken's presentation that I think needs some

22  clarification.   There are some other things I'd like to

23  state as far as our understanding goes.

24          With respect to the inventory that's listed

25  on -- I believe you indicated Defendant's 584, we

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 64

1    understand we make no warranty, express, implied or of any

2    kind.  This is as is.  We make no warranty as to the

3    quantities listed on here or the qualities listed on here.

4    We don't want somebody coming back saying that some of the

5    inventory that's listed on here is gone, stuff sitting

6    around in warehouses for a couple of years.  We make no

7    warranty as to quantity.  We will transfer faithfully, as

8    we indicated to the Court, to Warrior.

9         THE COURT:  Mr. Aiken, just so I'm clear, that was

10   my understanding of what your intent was in stating as is,

11   where is.  Is that correct?

12        MR. AIKEN:  Correct.

13        THE COURT:  With reference only to the document

14   that indicated inventory, that type of merchandise that

15   you might expect to find there, as is, where is?

16        MR. AIKEN:  Correct.

17        MR. MCDEVITT:  The other point in terms of the way

18   Mr. Aiken stated when the release would be effective, I

19   think he indicated that the release, full release intended

20   by the parties, would be effective on the payment of the

21   $890,000, which conceptually could delay the release until

22   next year.  I don't think that's what was intended.

23        THE COURT:  I think what I heard was when the

24   $90,000 is deposited into the court, at that time the

25   money will have been paid.  Is that correct?

SUPERIOR COURT - MARICOPA COUNTY

8

1        MR. AIKEN:  That's correct.

2        MR. MCDEVITT:  That's what I was going to suggest.

3        THE COURT:  That's what I thought I heard.  I also

4    understand it could have been interpreted the other way.

5    I think that's okay to clarify that.

6        MR. MCDEVITT:  All right.  Disparagement.  I might

7    have missed some words Mr. Aiken said, but I think it's

8    intended to mean broadly, the internet, TV, print of any

9    kind or media of any kind.  A general no disparagement

10    clause, anytime, anyplace.

11        MR. AIKEN:  Correct.

12        MR. MCDEVITT:  With respect to the $90,000 that's

13    being deposited with the court clerk, what we would

14    propose to do to make that less likely to be deemed a --

15    to be a forfeiture, is to make payment of that condition

16    precedent in compliance with that year.

17            If there is any allegation that has been

18    breached, it would be our obligation to prove it.  But if

19    it were proved that there was a breach of it, then because

20    the condition had not been satisfied to payment, the money

21    would come back to Titan with all the interest, so we

22    don't get into whether it's a forfeiture or something like

23    that.  It is a condition precedent to payment more

24    specifically than a contract obligation.

25        THE COURT:  Well, I'm not sure that adds anymore

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 66

1   clarification to what Mr. Aiken already said, because I

2   think the parties understand that the right to the 90,000

3   at the end of the term is contingent upon the fulfillment

4   of the terms of the confidentiality agreement.

5           MR. AIKEN:   Correct.

6           THE COURT:   If it is alleged and proven that it was

7   not complied with, then they don't get the money.   Unless

8   you are going to make a voluntary contribution to this

9   Superior Court, I would assume it goes back to you folks.

10          MR. MCDEVITT:   That's the next phase I was going to

11  get to.   Also, it is my understanding that the

12  confidentiality agreement is permanent, not for a year.

13          THE COURT:   I hope the parties understood that the

14  confidentiality agreement is an agreement that runs

15  through the entire course of the agreement in perpetuity.

16  That the clause applying to the 90,000 only occurs for one

17  year.

18              If there's an alleged breach at some later

19  date, and someone wants to come into court and allege it

20  and prove it, and prove the damages -- like any other

21  contract, if there's a breach, then the folks can do what

22  they want to do with it.

23          MR. MCDEVITT:   Your Honor, our understanding of the

24  confidentiality agreement binds not only plaintiff in this

25  case, but also the Warrior's wife, which is a material

SUPERIOR COURT - MARICOPA COUNTY

1(

1    part of this.  So she's going to have to signal her

2    agreement to this on the record in a binding way for that.

3         THE COURT:  I think that was probably one of the

4    assumptions everyone was working under, that she wasn't

5    going to go out and tell anyone.  I think there was an

6    assumption that it did bind them both, and which I think

7    they were probably operating under the entire time.  If

8    I'm mistaken on that -- let me make sure, though.

9         MR. MCDEVITT:  We did name -- something was said in

10   that material that did bind her.  We talked about that.  I

11   assume it's no problem, but we want to make it clear that

12   she, too, agrees to be bound by what I think is a

13   perfectly clear agreement and you folks don't have any

14   problem with that.

15        MRS. HELLWIG:  Is there something you want me to

16   say?  I agree to that.

17        THE COURT:  That's fine.

18        MR. MCDEVITT:  With respect to future relationships

19   between the parties -- I should say to be more precise,

20   the lack of, there's some language that we wish to put in

21   that we think reflects the understanding.

22             I talked with Mr. Murray and Mr. Aiken in

23   terms of the so-called intellectual property right for

24   purposes of this.  Where I use the word Titan, I'm

25   referring to Titan as well as the legal successor, World

SUPERIOR COURT - MARICOPA COUNTY

1   Wrestling Federation Entertainment, Inc., which I assume

2   Shawn was also referring to whenever he was referring to

3   Titan.

4         THE COURT:  And I assume that applies to Ultimate

5   Creations, Inc., also, as do all the terms of the

6   agreement, because that's who is entering into it, as well

7   as Warrior?

8         MR. MCDEVITT:  We agree, Judge.  For purposes of

9   the clause, I'm going to read or the language I'm going to

10   read is the Ultimate Warrior and the Warrior character.

11   What I'm referring to -- what I'm simply referring to is

12   the Ultimate Warrior character rather than repeat Ultimate

13   Warrior.  The clause I'm about to read or the language I'm

14   about to read, rather than repeat Ultimate Warrior every

15   time, I'm simply going to state the Ultimate Warrior

16   character with our understanding that it refers to both

17   the Ultimate Warrior character and the Warrior character.

18         With that statement, it's our understanding

19   that the plaintiffs agree that Titan is the owner of the

20   character depicted in Titan copyright works, and in works

21   which record or depict the Ultimate Warrior character

22   which Mr. Hellwig, now known legally as Warrior, performed

23   with WWF, and have all rights afforded the owner of such

24   rights, including but not limited to the exploitation of

25   those rights in any and all media, including but not

SUPERIOR COURT - MARICOPA COUNTY

12

1   limited to the internet, media forms now existing or in

2   the future without further or any compensation to the

3   plaintiffs or their successor, notwithstanding the

4   foregoing:  Warrior, the man, the legal entity formerly

5   known as James Hellwig, shall have the right to perform

6   the character in the future in any and all manner,

7   henceforth without the claim of infringement by Titan.

8           Titan or WWFE to make on his own right or

9   authorize others to make new copyright works depicting the

10  character which shall belong to him.

11          With respect to trademark and service mark

12  rights, it's our understanding that Warrior, formally

13  known as James Hellwig, shall own the trademarks and

14  service marks to Ultimate Warrior and Warrior characters.

15  But Titan shall, however, continue to have the right of

16  fair use of the marks and any and all other rights

17  afforded to it as a result of his ownership of and rights

18  to exploit the forgoing copyrights and character in the

19  copyright works it owns.

20          I think we have covered, your Honor, the

21  merchandise.  It is also, your Honor, our understanding

22  that this agreement is intended to be a complete, total,

23  final determination of any and all business or commercial

24  relationships between the parties.  And that the

25  plaintiffs enter into this agreement with no expectation

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 70

13

1    of any kind of any future income from Titan in the form of

2    royalties or elsewise.

3              I think Shawn covered dismissal with

4    prejudice of both this case and the case in Connecticut,

5    with each party to bear its own attorneys' fees and costs

6    in the timetable that I think he indicated.  And I think

7    that's it, Judge.

8         THE COURT:  Mr. Gilbert.

9         MR. GILBERT:  On confidentiality, I think, Shawn,

10   what you had indicated was simply that the terms of this

11   were covered by a confidentiality agreement.  I think we

12   ought to clarify that further and say what it is intended

13   to say.

14             Nondisclosure of the terms, any term of

15   conditions of this settlement, or what has been agreed

16   today other than the fact that the case has been settled

17   and the cases have been dismissed.

18        MR. AIKEN:  That's correct.

19        THE COURT:  And that confidentiality agreement

20   precludes either party from saying anything about the

21   agreement any further.  If you folks want to disclose

22   that, and you certainly don't have to, but I think you

23   ought to be able to say that, so you put the blame on me

24   for not letting you disclose it, if you want to do that.

25   The Court's not going to let you disclose the remainder of

SUPERIOR COURT - MARICOPA COUNTY

14

1    the terms, period.  Anything further?

2           MR. GILBERT:  One thing, your Honor.  You indicated

3    that you were going to order the transcript of the

4    proceeding sealed, which is certainly understandable.

5           THE COURT:  After you folks each get a copy.

6           MR. GILBERT:  Right.  I wanted to make sure.

7           THE COURT:  No, I'm going to let you have a copy.

8           MR. GILBERT:  Just so it's on the record.  Thank

9    you.

10          MR. MURRAY:  The only disclosure I'd like to add to

11   Mr. McDevitt's comments with respect to the trademarks and

12   service marks concerning the Ultimate Warrior and Warrior

13   character is the Titan releases on to Warrior, formerly

14   Mr. Hellwig, and registrations thereof throughout the

15   world.

16          MR. MCDEVITT:  Do we still have them?

17          THE COURT:  If you have any, are you willing to

18   execute whatever documents are necessary to insure there's

19   no question about that?

20          MR. MCDEVITT:  I thought most of them were

21   transferred to him already.

22          MR. MURRAY:  My understanding is we have certain

23   problems in obtaining transfer registrations to

24   Mr. Hellwig or his company in countries like China and

25   Japan.

SUPERIOR COURT - MARICOPA COUNTY

EXHIBIT E, page 72

15

1          MR. MCDEVITT:  We have no problem with that, Judge.

2    I'm not aware of any.  If there are any, I assume you --

3          THE COURT:  The obligation would be with these

4    folks to provide the appropriate paperwork for the

5    releases.  And -- let me ask the plaintiffs first.

6                 Mrs. Hellwig, is there anything you would

7    like to add for the record?

8          MRS. HELLWIG:  No.  Thank you for your time.

9          MR. HELLWIG:  No, sir.

10         THE COURT:  Mr. and Mrs. McMahon, is there anything

11    that you folks would like to add for the record?

12         MRS. MCMAHON:  No.

13         MR. MCMAHON:  I'm hungry.

14         THE COURT:  I think you definitely earned a good

15    dinner, all of you.

16         MR. AIKEN:  Thank you very much.

17         THE COURT:  Thank you.

18         MR. AIKEN:  I appreciate your time staying.

19         THE COURT:  You folks staying today set a new

20    record.

21         MR. MURRAY:  Thank you.

22

23                     *  *  *  *  *

24

25

SUPERIOR COURT - MARICOPA COUNTY