Daniel D. Maynard, No. 009211
Jennifer A. Sparks, No. 017502
**MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.**
1800 Great American Tower
3200 North Central Avenue
Phoenix, Arizona 85012
(602) 279-8500

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ultimate Creations, Inc., an Arizona corporation,<br><br>      Plaintiff,<br>v.<br><br>THQ, Inc., a corporation,<br><br>      Defendant. | CV 2005-1134-PHX-SMM<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT THQ'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**(Oral Argument Requested)** |

Plaintiff, Ultimate Creations, Inc. ("UCI"), opposes THQ's Motion for Summary Judgment or in the alternative, partial summary judgment on each claim for relief. This response is based on the ground that there are genuine issues as to material facts that foreclose THQ from being entitled to judgment as a matter of law.

**Memorandum of Points and Authorities**

**I. Introduction**

This case concerns Warrior, who created a character in professional wrestling entertainment. SOF, ¶ 7. He obtained federal registrations on some of his intellectual property associated with the character and on others, he has common law rights. SOF, ¶¶ 3, 4. This property was licensed to his wholly owned company, UCI. SOF, ¶ 4. He was approached by THQ to license the Warrior intellectual property to use in THQ's video games. SOF, ¶ 16. Prior to reaching an agreement, THQ announced that Warrior would be in its next video game

but had to retract the announcement because they could not reach agreement. SOF, ¶ 25. THQ then released its game and Warrior could be made in the game. Everything THQ wanted to license was in the game, but the player had to find it and put it together. THQ took Warrior's character, identity, moves, entrance, logo and all his intellectual property and did not pay for it. Some would call it theft or at least unfair competition. Thus, this case is about a company using someone else's property to make a profit and not paying for it.

UCI filed a three count complaint against THQ. UCI's first claim is for infringement of federally registered trademarks and service marks. The second claim is for unfair competition under Section 43(a) of the Lanham Act and the third claim is for infringement of common law trademarks and common law unfair competition.

UCI is a company wholly owned by Warrior, an individual who performed as a professional wrestling entertainer who owns and licenses numerous trademarks and service marks that include Warrior Reg. No. 1,708,155 "Warrior" for posters; 2,299,387, Warrior for sports entertainment services; 1,625,919 "Ultimate Warrior" for poster, t-shirts and entertainment services; 1,818,813 "Ultimate Warrior" for video/audio cassettes, films, CDS, laser discs, and records; 1,838,771 "Ultimate Warrior" for toys and sporting goods and 2,345,959, for design mark for entertainment services. SOF, ¶¶ 2, 4.

In 2003, UCI was in negotiations with THQ to license the name Warrior and/or Ultimate Warrior along with the right to use Warrior's character, image, logo, entrance, signature moves and likeliness, in its video games. SOF, ¶¶ 16, 17. THQ had conducted a contest asking the purchasers of wrestling video games what wrestling characters they most wanted to see in their wrestling video games and the overwhelming response was that they wanted Warrior. SOF, ¶ 23.

THQ announced that Warrior would be in its new video game in 2003, Day of Reckoning; however, it had not reached a licensing agreement with UCI. SOF, ¶¶ 19, 23. THQ had to retract its advertising that Warrior would be in the video game. SOF, ¶¶ 20, 23.

UCI entered into a license agreement with a competitor of THQ to license the Ultimate Warrior and Warrior character, likeness, moves, entrance and persona. SOF, ¶ 50.

During the same period, an affiliate of THQ, JAAKS Pacific, Inc., that manufactures action figures entered into a licensing agreement with UCI to produce a Warrior action figure. SOF, ¶ 51.

Some years later in 2005, Warrior received information from different individuals who play the THQ wrestling games, including one from England, that the Warrior character was in the THQ wrestling games. SOF, ¶ 34. Warrior's fans questioned whether he knew that his character was being used. SOF, ¶ 34.

For these reasons, UCI brought this lawsuit to protect its intellectual property alleging trademark violations and unfair competition since THQ is utilizing the Warrior marks, the Warrior likeness, the Warrior move sets, and the Warrior attributes for THQ's economic benefit without permission and without paying compensation.

**II.   Background on the Character**

   **A.   Warrior**

Warrior performed as a professional wrestling entertainer as the Ultimate Warrior and Warrior for World Wrestling Entertainment ("WWE"), formerly known as the World Wrestling Federation between 1986 and 1996. From 1990-1991, Warrior was the WWF World Wrestling Champion. SOF, ¶ 15. Warrior's last televised wrestling performance was in 1998. SOF, ¶ 14. Warrior created an entertainment persona that had a distinctive look, a dynamic, unique entrance into the wrestling ring where he ran down the runway, jumped into the ring, ran around the outside of the ring, and shook the top rope while he ran around the ring and ended up in the corner of the ring on the ropes pumping his arms. SOF, ¶ 12. He developed a signature closing move or come back move where he would pull himself up the ropes, pump his arms to the sky, then hit his opponent and bounce off the ropes three times each time clotheslining his opponent and the last time he would pick up his opponent and press

him over his head and drop him behind his back then pin him. SOF, ¶ 13. These were the things that THQ wanted to license for its video game. SOF, ¶ 17, and what UCI did license to Acclaim for its video game. SOF, ¶ 50.

During the past eight years, Warrior has licensed his image and his service marks and trademarks to various companies for t-shirts, comic books, Warrior Gym, action figures and video games. SOF, ¶¶ 50, 51. In recent years, Warrior has done a great deal of public speaking based upon his success as a personality and still utilizes Warrior images in the form of posters and pictures at his various speaking engagements. SOF, ¶ 31. Additionally, Warrior operates a website (www.ultimatewarrior.com) on which he discusses life philosophies and public issues. THQ SOF, ¶ 5.

**B.     THQ Video Games**

THQ is a leading worldwide developer and publisher of video games. THQ SOF, ¶ 7. In recent years, it has developed numerous wrestling games. THQ SOF, ¶ 10. THQ has marketed approximately 12 wrestling video games in the past seven years. The various video games are known as:

1.   Game Boy Advance - "Survivor Series"
2.   Nintendo GameCube video - "Wrestlemania XIX"
3.   Nintendo GameCube video - "Crush Hour"
4.   Nintendo GameCube video - "Day of Reckoning"
5.   Nintendo GameCube video - "Day of Reckoning 2"
6.   PlayStation 2 video - "SmackDown! Here Comes the Pain"
7.   PlayStation 2 video - "Crush Hour"
8.   PlayStation 2 video - "SmackDown! vs Raw 2006"
9.   PSP (Playstation portable) video - "SmackDown! vs Raw 2006"
10.  XBox video - "WWF RAW"
11.  XBox video - "WWF RAW 2"

12. XBox video - "Wrestlemania 21 Become a Legend"

THQ advertises that it uses legends of wrestling in its video games. SOF Opposition, ¶¶ 11, 12. Some of the legends can only be reached after certain goals are achieved in the game. SOF, ¶¶ 38-40. Thus, the legends of wrestling are held out as a prize to achieve.

### C. WWE Characters in THQ's Video Games

THQ's video games contain numerous well-known wrestling characters from the present and the past. SOF Opposition, ¶¶ 11, 12. THQ ran a contest in 2003 and requested potential purchasers of its games to vote on the character that they most wanted to see in the newest release of the video game and the players voted for Warrior. SOF, ¶ 23. THQ contacted Warrior about licensing his marks and having Warrior in the games. SOF, ¶ 16. There were numerous negotiations, but ultimately, the negotiations broke down and no agreement was reached. SOF, ¶¶ 17, 19. THQ wanted to enter into a non-exclusive licensing agreement to use the likeness, moves, music, marks, trade dress associated with Warrior. SOF, ¶ 17. Prior to entering into a license agreement, THQ announced to the public that Warrior would be in its new game. Within days, THQ had to announce that Warrior would not be in its new game. SOF, ¶ 20. UCI licensed the Warrior character, along with his entrance, moves, likeness, and marks, to a competitive video game. SOF, ¶ 73. Also, UCI licensed the Warrior character, likeness, trademarks and trade dress to an affiliate company of THQ, JAAKS Pacific, Inc. to be used with action figures. SOF, ¶ 51.

### D. Create a Wrestler Feature

Contrary to THQ's statements, the ability to create a wrestler is not unlimited. SOF, ¶ 66. In THQ's most recent video game, SmackDown v. Raw 2007, Warrior cannot be created. SOF, ¶¶ 48, 66. THQ has placed in many of its wrestling video games the capability of creating numerous different characters and one of the characters that one can create is Warrior. SOF, ¶ 26. Numerous players of the game use websites called CAWs for "create a wrestler," and explain to each other how to create different characters in each game. SOF, ¶ 42. One of

the most popular of those characters is Warrior. Warrior is very distinctive for a number of reasons. He had a body builder body, he had long, flowing shoulder length hair, he generally wore bands around his arms and had knee pads or boots with fringe that contained the Warrior logo on them, and that is federally registered and he had his logo painted on his face. SOF, ¶ 47.

There are certain moves in wrestling that become characteristics for these individual characters. SOF, ¶¶ 7, 10. Warrior was the only wrestler that ran from the entrance all the way to the ring. Most wrestlers walked or strutted, but the Warrior was high-energy and he sprinted into the ring. SOF, ¶ 12. Warrior would then jump into the ring, run around the outside shaking one arm, then he would shake the top rope in a very vigorous manner before climbing up the ropes in one corner of the ring and raising his arms. SOF, ¶ 12. This entrance can be created in numerous THQ games and individuals who follow wrestling know that entrance was the one used by the Warrior. SOF, ¶¶ 40, 43, 44.

Warrior was very strong and his signature closing or comeback move was to pull himself up the ropes, pump his arms, knock his opponent down, then bouncing off the side ropes three times, and each time closelining his opponent and then picking up his opponent over his head, pressing them and then dropping them behind his back before he would pin them. SOF, ¶ 13. This move can be created in many of the THQ video game. SOF, ¶ 26. The entrance and closing moves are not associated with any other wrestling characters. THQ advertises that its games contain the entrances and signature moves of its characters. SOF Opposition, ¶ 74.

THQ has created the distinctive wrestling moves of Warrior within its games which allows the individual to create the Warrior character and it allows the Warrior character to enter the ring in his unique manner and to perform his signature moves. SOF, ¶ 44.

Many consumers communicate on how to make the character, produce his entrance, and his signature moves on websites called "Create A Wrestler" or CAWs. SOF, ¶ 42. THQ

- 6 -

admits that the Warrior character can be made in some of its games. Deposition of Kathy Vrabeck, Exhibit 9 attached hereto. THQ wanted the Warrior character in its games because it sought to enter into a licensing agreement with UCI for the rights to Warrior moves, entrance, and marks. SOF, ¶¶ 16, 17. THQ announced that Warrior would be in its newest game. SOF Opposition, ¶ 23. After the licensing negotiations fell apart, THQ left the capability of making the Warrior character in its games, including his character, his logo, his name, his face paint, costumes and various other identifiers such as that he is from "Parts Unknown" and the Warrior character is always identified as being from "Parts Unknown." SOF, ¶ 45. THQ has profited from the Warrior character and its games give the players the capability of creating the Warrior character, putting the face paint on the character, having the character dress like Warrior, enter the ring like Warrior, do Warrior's signature moves, be announced as Warrior, and be from "parts unknown," just as Warrior. SOF, ¶¶ 44-45.

UCI welcomes the opportunity to bring the various THQ games to the Court so that the Court can see for itself how easy it is to create Warrior, his logo, face paint, entrance, signature moves, and other attributes. In a trademark infringement and unfair competition case, the Court should look at the infringing product to determine if there is a likelihood of confusion as to sponsorship. In the current case, THQ wanted to use property owned by UCI and when it could not reach an agreement, so it took the property and hid it in the world it created and said to the players -- go find it. The word spread fast through the CAWs how to find Warrior in various games. THQ profited and Warrior did not.

### III. Argument

#### A. Legal Standards for Summary Judgment

The Court's role under Rule 56 is limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Thus, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party,

all evidence will be construed in the light most favorable the non-moving party, and all reasonable inferences will be drawn in the non-party's favor. *Beard v. Banks*, __ U.S. __, 126 S. Ct. 2572, 2578, 165 L.Ed.2d 697 (2006). The Court will not weigh the credibility of witnesses or other evidence in ruling on a motion for summary judgment since evaluating credibility, weighing evidence, and drawing factual inferences are functions reserved for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

  **B. UCI's Claim for Infringement of Federally Registered Marks**

  UCI has numerous federally registered trademarks that are being utilized by THQ in its video games, which include, Warrior, Ultimate Warrior, Generation Warrior, and Warrior logo. These marks are owned by UCI and THQ attempted to license the marks and when it failed, it left the marks in its games. UCI currently licenses the marks to THQ's corporate affiliate, JAAKS Pacific, Inc., to be used on action figures. THQ argues that even if UCI owns registered marks, and that they are valid trademarks, UCI's claim of infringement of these marks cannot survive because there is no evidence that THQ has made a trademark use of them. This is a disingenuous argument by THQ in that it is aware that its corporate affiliate JAAKS Pacific, Inc., has entered into licensing agreements to utilizes these marks on action figures and a license is currently in effect. SOF, ¶ 51. Additionally, UCI licensed the trademarks to be used in a video game produced in 2003 to Acclaim, Inc. SOF, ¶ 50. Also, Warrior uses the marks on his website and in relation to his speaking engagement business.

  There is actual confusion. Members of the public as shown through CAWs recognize that the Warrior character can be made and communicate it to others. The CAWs describe how to make the Warrior logo and face paint logo. The question is, is it legal for THQ to use UCI's federally registered marks without paying for them? The answer is no.

### 1.   THQ Violates the Ultimate Warrior Mark.

Although one cannot find the trademark Ultimate Warrior or Generation Warrior in THQ's video games, its use of the name Warrior violates all of UCI's trademark rights. UCI has the registered mark on Warrior, Ultimate Warrior and Generation Warrior. One does not have to violate the entire mark to commit trademark violation or infringement. An infringer is not absolved from liability merely because it has not replicated every aspect of a trademark. The scope of protection of a registered mark is not limited to exact replication of the mark as it appears in the registration certificate. *Cullman Ventures, Inc. v. Columbian Artworks, Inc.*, 717 F.Supp. 96 (S.D.N.Y. 1989). Any use of the word Warrior in THQ's video games violates UCI's marks.

### 2.   Warrior Call Name Does Infringe Warrior Mark.

THQ conducted a contest in which the voting fans wanted the Warrior character in the next THQ game. THQ announced that Warrior would be in the game; however, it was not successful in entering into a licensing agreement with UCI. Nevertheless, THQ released its next game and within the game, one could build Warrior so that the animated character looked like Warrior, it dressed like Warrior, it used the same ring entrance as Warrior, it used the same finishing moves as Warrior, it was announced as Warrior, and one could have its home of origin as "Places Unknown," which is where Warrior was from. THQ intended that Warrior be in its game.

UCI owns the registration of the name Warrior as a service mark and trademark and this precludes THQ from using the name in its video game concerning wrestling. THQ argues that a defendant may use a term that is another's trademark to describe his own goods or services under the doctrine of fair use. 15 U.S.C. § 1115(b)(4) and citing *New Kids on the Block v. News American Publishing*, 971 F.2d 302 (9th Cir. 1992). The Ninth Circuit in *New Kids* held that the purpose of trademark law is to prevent the producers from free riding on their rivals mark and that a trademark is a limited property right in a particular word, phrase, or symbol.

*See New Kids*, 971 F.2d at 305. Competitors may use a rival's trademark in advertising if the use is not false or misleading. *New Kids*, 971 F.2d at 307.

In the present case, there was no reason for THQ to use the name Warrior. It was aware that Warrior was a registered mark by a famous wrestler; THQ had tried to license it. Warrior was not used in its generic sense, but was rather intended to be used in its trademark sense so that those who bought the game that wanted to play with Warrior could then put that name with the character that they built.

THQ argues that the use of the name Warrior cannot cause confusion as to the source of THQ's game; however, what THQ fails to address is that the use of the name Warrior within the game causes confusion as to sponsorship; *i.e.*, that being whether Warrior has sponsored the game. THQ included the trademarked name of a famous wrestler who was the world champion who they negotiated with to license his trademarks within its game, so that those who buy the game can place the name next to a character that they build that looks like Warrior and thus satisfy their need to play the game with Warrior without THQ having to pay for the right to use UCI's intellectual property. The use of the name Warrior does cause confusion as to sponsorship. What THQ fails to acknowledge is that it recognized in the licensing negotiations that Warrior was a name that its customers wanted to be able to use with an animated character that would look like Warrior. When THQ was not able to obtain that license, it took it upon itself to give its customers the capability of creating that character, including not only his look, his costume, his entrance, his moves, the logo on his costume, and face and in this case, the use of his registered service mark, Warrior.

### 3.  THQ's Use Is Not Protected by the First Amendment.

The Supreme Court has said that "federal law requires that all ideas in general circulation be dedicated to the common good" unless protected by a legally valid exclusive right such as that given by patent, trademark, or copyright law. *Lear Inc. v. Adkins*, 395 US. 653, 23 L.Ed.2d 610, 89 S. Ct. 1902 (1969). The courts have recognized that the First

Amendment is not a license to trample on legally recognized rights and intellectual property. *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184 (5th Cir. 1979). THQ's reliance on *Matel Inc. v. MCA Records, Inc.*, 296 F.3d 894 is misplaced. Matel, the owner of the trademark for the doll, Barbie, sued the defendant who had put out a song called Barbie Girl. The Court recognized that the First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark. *Matel Inc.*, 296 F.3d at 900. The Court recognized that the titles to books, movies and songs are different. Consumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer. The Court citing to *Rogers v. Grimaldi*, 875 F.2d 994 (9th Cir. 1989) concluded that literary titles do not violate the Lanham Act "unless the title has no artistic relevance in the underlying work whatsoever or if it has some artistic relevance unless the title explicitly misleads as to the source or context of the work."

THQ's argument is misleading because the decision in *Matel* deals strictly with the title to artistic works, not to the use of one's trademark within the body of the work itself. In the present case, consumers were aware, as was THQ, that they wanted Warrior in the THQ game. Today, information travels quickly among various groups through the Internet. As pointed out in the Statement of Facts, many players of the THQ wrestling games communicated with each other through various websites and explained to each other how to make Warrior. Warrior is recognized as being within the THQ games and it is communicated between the players of the game.

    **4. THQ's Use of the Design Mark Is Confusingly Similar to That Registered and Owned by UCI.**

UCI has a design registration 2,345,959. A design that is confusingly similar to the registered mark is contained within the THQ games. The individuals who play the games recognize that the design mark is associated with Warrior and they communicate with each other how to create the Warrior character and place the design mark on his face, or on parts of his costume. SOF, ¶¶ 42, 49. THQ's position seems to be that the individual who are

- 11 -

violating the Warrior's trademarks are those who play the game not THQ. What has happened is that THQ has created its own world provides the individuals who play the game the capability of violating Warrior's trademarks.

In dealing with a logo, similarity of appearance between marks is nothing more than a subjective eyeball test. *Exxon Corp. v. Texas Motor Exchange, Inc.,* 628 F.2d 500 (5th Cir. 1980). For design marks, similarity of appearance is controlling. While there may be a number of differences between design and pictures marks, if the overall impression created by the marks is essentially the same, then it is very probable that the marks are confusingly similar. *See* McCarthy on Trademarks, § 23:25.

There are several ways to prove likelihood of confusion, including evidence of actual confusion and/or argument based on an inference arising from judicial comparison of the conflicting marks themselves and the context of their use in the market place. *See* McCarthy on Trademarks, § 23:63. Thus, the decision maker can decide the issue by inspection of the conflicting marks and their manner of use. This is not a subjective judgment as to whether the judge, jury, or trademark examiner would personally be confused, but rather, whether the ordinary prudent customer in the market place would likely be confused. The Ninth Circuit has held that when the issue of likelihood of confusion is in doubt, the question will be resolved in favor of the senior user. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, n.14 (9th Cir. 1997).

The Lanham Act § 32(1)(a), 15 U.S.C.A. §1114(1)(a) reads as follows:

> Any person who shall, without the consent of the registrant (a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with use is likely to cause confusion with which such use likely to cause confusion, or to cause mistake or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

While the presumptive validity of the mark is limited to the goods or services specified in the registration (McCarthy on Trademarks, § 32:134), the infringer is not absolved from

- 12 -

liability merely because it has not replicated every aspect of the trademark. The scope of protection of the registered mark is not limited to exact replication of the mark as it appears in the registration certificate. *Cullman Ventures, Inc. v. Columbian Artworks, Inc.*, 717 F. Supp. 96 (S.D.N.Y. 1989). Consumers believe the federally registered logo is in the game and by the use of it on the Warrior face paint and costumes. THQ has used UCI's federally registered logo.

### C. Unfair Competition Under Section 43(a) of the Lanham Act.

THQ is violating Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) by using the Ultimate Warrior or Warrior character or likeness, the signature moves associated with that character, the entrance, the logo, the costume, the face paint, and other intellectual property that constitutes trade dress. THQ argues that the claim fails for two reasons. First, that UCI cannot pass the threshold validity requirement because UCI cannot articular any protectable trademark or trade dress interest in the character, likeness, or moves that prevent THQ from using them, and second, UCI's claims fail because there is no evidence that THQ has made any infringing use of the alleged intellectual property.

#### 1. THQ is Using the Warrior Character and Likeness for its Own Benefit and in Violation of the Law.

As pointed out in the Statement of Facts, Warrior became a wrestling icon in the 80s and 90s and was the WWF World Champion. He has licensed his likeness and trademarks to THQ's affiliate company, JAAKS, for the manufacturing of action figures. Warrior created distinctive moves that became associated with his character. First, is the entrance into the ring. As described earlier, Warrior's entrance was very distinctive. He ran full speed into the ring with high dynamic music. He jumped into the ring, ran around the ring, and then grabbed the ropes and would shake the ropes as he circled the ring before climbing on the ropes in a corner and pumping his arms. No other wrestler had this signature entrance. This entrance, along with his signature moves and look which includes the logo painted on his face and his costume

and, his costume acts as trade dress. Lanham Act § 43(a) is the vehicle for trade dress protection and the trade dress configuration need not be federally registered. Trade dress must be recognized by consumers as being associated with the plaintiff. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 120 L.Ed.2d 615, 112 S. Ct. 2753 (1992). In this case, customers through the CAWs create Warrior's entrance and signature moves, likeness, logo, costume, and character. Warrior's entrance, look and signature moves are not functional. Lastly, it is clear the customers believe Warrior is in the games and he has been contacted concerning whether he sponsors the use of his trade dress or likeness.

Second, each wrestler has distinctive characteristics or moves when they reach a certain level. Warrior had a signature entrance, signature move and a unique look with his logo painted on his face and a distinctive costume with his logo on it. The wrestling fan public recognize Warrior's signature moves, entrance and look. THQ recognized the same. In the game of SmackDown! Here Comes the Pain, THQ has a set of moves under the heading "OUW," which we believe stands for Old Ultimate Warrior. When one clicks into those moves, it is a preset group of moves that allows the character to run to the ring exactly as Warrior did, jump up in to the ring and shake the ropes, and then perform Warrior's signature moves. The CAW shows that customers believe this is Warrior's moves. In most of the games, THQ has provided the capability of allowing its character to run into the ring and to be able to wrestle in the style and manner that was distinctive to the Warrior.

An entertainment costume can be a registerable mark. *In re Red Robin Enterprises, Inc.*, 222 U.S.P.Q. 911 (T.T.A.B. 1984). The unregistered names in performing groups can be protected in federal court under traditional rules of trademark and unfair competition by using the Lanham Act, § 43(a). *See Estate of Presley v. Russen*, 513 F.Supp. 1339 (N.D.N.J. 1981)(Elvis Presley). A performers nickname may be protected under § 43(a) if used in a service mark sense. *See Foxworthy v. Tees*, 879 F.Supp. 1200, 1210 (N.D. GA 1995).

The courts have held that for trademark marks to be infringed, the unauthorized use

must cause a likelihood of confusion as to the source, sponsorship, affiliations or connection with a person or owner of rights in his or her identity. In the professional sports entertainment field, protection has been given to distinctive features of team cheerleaders. *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2nd Cir. 1979).

The courts have recognized that the author or creator of a distinctive characterization, (whether delineated in words or pictures) has the right to have the character exclusively identified with the author. It has been held that trademark law, through Lanham Act § 43(a) protects the physical appearances and costumes of characters. McCarthy on Trademarks, § 10:42. Similarly, the appearance of characters in video games can be protected as non-functional design features. *Midway Manufacturing Co. v. Dirkschneider*, 543 F.Supp. 466 (D. NE 1981). Thus, it is a question of fact whether the name or description of a given character along with the entrance, signature moves, logo, face paint, costume, and look in general has achieved among the public special significance. Warrior certainly meets this test. THQ wanted to license Warrior's character, likeness, moves, entrance, look, logo, costume, and persona. If it were not unique, THQ would not have been willing to pay to use it.

Distinctive literary characterizations can be protected under unfair competition principles as against defendants who adapt the character in the entertainment field. In such cases, the theory supporting relief is either passing off (confusing the public into thinking the plaintiff has something to do with the defendant's efforts), invasion of the right of publicity or misappropriation (wholesale taking of plaintiff's theatrical identity). *See* McCarthy on Trademarks, § 10:45.

### 2. Likelihood of Confusion as to Sponsorship

THQ argues that the signature moves do not identify source and therefore, there can be no infringement. However, THQ forgets that source is not the only test. Likelihood of confusion is the basic test of both common law trademark infringement and federal statutory trademark infringement. *Two Pecos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 120 L.Ed.2d

1615, 112 S.Ct. 2753, 2758 (1992). Infringement of federally registered marks is governed by the test of whether the defendant's use is "likely to cause confusion, or to cause mistake, or to deceive. Lanham Act, § 32, 15 U.S.C.A. § 1114(1). A federal claim under Lanham Act § 43(a) for infringement of a unregistered mark is triggered by a use which is "likely to cause confusion, or to cause mistake, or to deceive as to the *affiliation, connection,* or *association*" of the user with the senior user. Lanham Act § 43(a), 15 U.S.C.A. § 1125(a). The Patent and Trademark Office uses the same test under Lanham Act § 2(d) in determining whether a mark that is the subject of an application for registration is likely to cause confusion with a previously used or registered mark. Thus, the test of likely of confusion is the touchstone of trademark infringement as well as unfair competition.

Confusion need not occur at the time or point of purchase. The vast majority of courts recognize post-sale confusion, which may occur among those who see an infringing mark and use by a owner who were not confused at the time they bought the product. McCarthy on Trademark, § 23:5. Confusion as to affiliation, connection, association or sponsorship is actionable. McCarthy on Trademark, §§ 23.4 and 23.8; see *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111 (6th Cir. 1996)(in case of alleged confusion between two golf courses, both named Champions, the issue is not whether golfers are confused about which course they are playing on, but rather, whether the courses are affiliated. This is the ultimate question to be answered in a likelihood of confusion inquiry. . . . The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation between the two clubs.) This broad scope of "confusion" was codified in 1989 in the Lanham Act § 43(a). A federal claim under Lanham Act § 43(a) for infringement of an unregistered mark is triggered by a use that "is likely to cause confusion or to cause mistake or to deceive as to the affiliation, connection, or association of the user with the senior user." Lanham Act § 43(a), 15 U.S.C.A. § 1125(a).

Confusion can result even if plaintiff's service or product is no longer being made or

used. The shape of a classic Ferrari sports car made from 1969 to 1974 was protected as distinctive trade dress as against the maker of a replica car. While the purchaser of an unauthorized replica knows it is not a genuine car, he may think that it is sponsored, approved, or licensed by Ferrari. Also, Ferrari's reputation for rarity and quality could be damaged if non-purchasers who see the replica on the road think it looks cheap or in disrepair. *See Esercizio v. Roberts*, 1111 U.S.P.Q.2d 1843 (S.D. CA 1989); 944 F.2d 1235 6th Cir. 1991). The Court stated that trade dress refers to "the image and overall appearance of a product." It embodies the identifying characteristics connected with the product intended to make the product distinguishable from others and to promote its sale. *Esercizio*, 944 F.2d at 1238-1239. That is exactly what we have here. The Warrior character is a product and the decorations and accouterments such as the costume, logo, face paint, entrance, signature moves, together, constitute trade dress that Warrior has developed to make his product different and marketable.

Convincing evidence of significant actual confusion occurring under actual market place conditions is the best evidence of the likelihood of confusion. Any evidence of actual confusion is strong proof of the fact of a likelihood of confusion. *Resorts of Pinehurst, Inc. v. Pinehurst National Corp.*, 148 F.3d 417 (4th Cir. 1998). Clearly, the CAWs demonstrate that customers believe Warrior is in the THQ games and he has received inquires from others about it.

**D.   THQ Has Infringed UCI's Common Law Trademarks and Has Committed Common Law Unfair Competition**

**1.   Common Law Unfair Competition**

Unfair competition is a commercial tort and is extremely flexible. *Golden Nugget, Inc. v. American Stock Exchange, Inc.*, 828 F.2d 586, 591 (9th Cir. 1987). Unfair competition is not a tort with specific elements, but rather describes a general category of torts which courts recognize for the protection of commercial interests. There is a common law tort of unfair competition. *Bonito Boats, Inc. v. Thundercraft Boats, Inc.*, 489 U.S. 141, 103 L.Ed.2d 118, 109 S. Ct. 971 (1989). The Supreme Court held in *INS v. Associated Press*, 248 U.S. 215, 63

L.Ed. 211, 39 S. Ct. 68 (1918), that the common law concept of unfair competition has not been confined to any rigid definition, encompasses a variety of types of commercial or business conduct considered to be contrary to good conscience, including acts of trademark and trade dress infringement, false advertising, delusion, and trade secret theft.

THQ's conduct must constitute unfair competition. It has taken another's property, that it tried to buy, but was not for sale, and used it for financial gain.

### 2. THQ's Has Misappropriated Warrior's Character, Likeness and Trade Dress

The synthesis of the majority of opinion in INS v. Associated Press, 248 U.S. 215, 63 L.Ed. 211, 39 S. Ct. 68 (1918) is that in order to prove a case for misappropriation, you must show three elements: 1) plaintiff made a substantial investment of time, effort, and money into creating the thing misappropriate such that the court can characterize the thing as a kind of property right, 2) defendant has appropriate the thing at little or no cost such that the court can characterize defendant's actions "reaping where is has not sown," and 3) defendant has injured plaintiff by the misappropriation. Generally, injury is proven by a direct diversion of profits from the plaintiff to the defendant. However, there is no requirement that the plaintiff and defendant be in direct competition. See McCarthy on Trademarks, § 10:5.

All of these elements have been met. Warrior invested a great deal of time, energy and money into creating his character, his registered and unregistered marks and intellectual property. THQ negotiated for the right to use his property but when unsuccessful, it used it without paying for it. UCI has been damaged since it cannot control how its property is used and it has received no compensation for the use of the property.

It is undisputed that Warrior is in the THQ games. The possibilities in a THQ game are not infinite since all of UCI's intellectual property cannot be found in all the games and Warrior cannot be made in the most recent THQ game. SOF, ¶¶ 44, 48. Thus, THQ is using UCI's property and it has not paid for it. This is common law misappropriation or unfair competition.

## IV. Conclusion

THQ wanted to use UCI's property, but UCI said no. THQ used it anyway without paying for it and hide it in its games, but its customers knew the property was there and used it to their delight. The Court should view the games and see how long it takes to make Warrior, whether the registered logo is used and review the moves and entrance to see if they are trade dress. There are copies of Warrior's performances on DVD and the Internet that will demonstrate his entrance and signature moves and the parties can easily bring in DVDs, the games, and the machines to play the games to demonstrate to the Court each side's position.

UCI believes that there are clear questions of fact as to whether THQ has violated or misused UCI's registered and unregistered trademarks and trade dress and whether THQ has committed common law unfair competition and unfair competition under the Lanham Act § 43(a). However, if the Court believes there is a close question, then UCI requests oral argument and the ability to play the games for the Court.

The motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED this 7th day of May, 2007.

        **MAYNARD CRONIN ERICKSON CURRAN & SPARKS, P.L.C.**

        By  s/Daniel D. Maynard
          Daniel D. Maynard
          Jennifer A. Sparks
          1800 Great American Tower
          3200 Central Avenue
          Phoenix, Arizona 85012
          Attorneys for Plaintiff

**ORIGINAL** of the foregoing filed this 7th day of May, 2007 via CM/ECF with:

Clerk of the Court
United States District Court
401 W. Washington
Phoenix, AZ 85003

with a copy mailed (along with a copy of the NEF) and electronically mailed this same day to:

Hon. Stephen M. McNamee
United States District Court
401 W. Washington
Phoenix, Arizona 85003-2120
mcnamee_chambers@azd.uscourts.gov

with a copy electronically mailed this same day to:

| | |
|---|---|
| Steven A. Marenberg, Esq.<br>Katharine Galston, Esq.<br>*Irell & Manella LLP*<br>1800 Avenue of the Stars, Ste. 900<br>Los Angeles, CA 90067-4276<br>Attorneys for Defendant | Andrew F. Halaby<br>*Snell & Wilmer LLP*<br>One Arizona Center<br>400 E. Van Buren<br>Phoenix, AZ 85004-2202<br>Attorney for Defendant |

   s/Stacey Tanner