# EXHIBIT A

EXHIBIT A

LICENSE AGREEMENT

This license agreement dated February 1, 2006 (hereinafter referred to as "Agreement"), is between Ultimate Creations, Inc. (hereinafter referred to as "Licensor"), 43 A County Road 119 North, Santa Fe, New Mexico 87506 and JAKKS Pacific, Inc. (hereinafter referred to as "Licensee") located at 22619 Pacific Coast Highway Suite 250 Malibu, California 90265.

WITNESSETH:

WHEREAS, Licensor is the proprietor of the right of publicity associated with the name, likeness, voice, signature and visual representation of the professional wrestling legend known as "Warrior" and/or "The Ultimate Warrior" (hereinafter referred to as "Property").

WHEREAS, Licensee desires to utilize said Property upon the terms and conditions set forth below.

NOW THEREFORE, in consideration of the mutual promises and undertakings herein contained and for other good and valuable consideration, intending to be legally bound, the parties agree as follows:

1. Definition of Terms.

(a) "Consumer Sales" shall mean sales of Goods by Licensee directly or through its authorized wholesalers, representatives or distributors to retail establishments for eventual resale to the consumer.

(b) "Mail Order Sales" shall mean sales of Goods by Licensee directly to the consumer through direct mail solicitation or catalogues.

(c) "Shopping Network Sales" shall mean sales of Goods by Licensee directly or through its authorized representatives, wholesalers and distributors through media such as infomercials; local, cable, wireless or fiber optic television shopping channels, on-line shopping, or otherwise.

(d) "Original Term" shall mean the period beginning on January 1, 2006 and ending on December 31, 2007.

(e) "Contract Year" shall mean the period commencing on January 1st and ending on December 31st of each year of this Agreement.

(f) "Premium" shall mean any article used for the purpose of: increasing the sale of another item; promoting or publicizing any product or service; fund-raising or as giveaways; to motivate a sales force, merchant, consumer, or any other person to perform a specific act.

(g) "Net Invoice Price" shall mean the invoiced amount of all Goods sold by Licensee, less any outward shipping charges and freight invoiced to the Licensee's customers; sales taxes; credits for returns and normal trade discounts and allowances, including defective and advertising allowances; provided, that, in all instances a deduction of not more than 5% of gross sales may be taken for returns and trade discounts and allowances.

2. Grant of License.

(a) Subject to the limitations set forth in paragraph 2(c) below and the other conditions of this Agreement, Licensor hereby grants to Licensee the non-exclusive right to use the Property on the following merchandise (hereinafter collectively referred to as "Goods"):

Seven inch (7") action figurines, packaged individually with an approximate retail price of $9.99;

Seven inch (7") action figurines, packaged as a 2-pack, with an approximate retail price of $14.99. Licensee shall have the right to make no more than one (1) 2-pack utilizing the Property based on the Wrestlemania VI match between "The Ultimate Warrior" and "Hulk Hogan."

Should Licensee desire to use the Property in connection with any other 2-pack or 3-pack (hereinafter collectively referred to as "Multipacks") or 14" figurines, Licensee acknowledges and agrees that it must first seek and obtain the permission of Licensor. Notwithstanding the foregoing, Licensee agrees to produce for Licensor only the following limited edition sets:

(i) One (1) Limited Edition set of no more than twenty (20), individually packaged "Ultimate Warrior" figurines; and

(ii) , One (1) Limited Edition set of no more than twenty (20), 2-packs featuring the "Ultimate Warrior" and "Hulk Hogan" from their match in WCW.

Licensor agrees to permit Licensee to retain no more than five (5) units of each of said Limited Editions for Licensee's internal, corporate purposes. Licensee shall not be permitted to sell or auction any of the five (5) limited edition 1- or 2-packs. If Licensee transfers any of said five (5) Limited Edition 2-packs to a third party without selling them, and the third party thereafter transfers to subsequent recipients, Licensee shall not be liable fore the actions of the third parties or any subsequent recipients.

(b) Market and Territory: Licensee shall only make sales of Goods as described in paragraph 1(a), (b), and (c) above, as well as through any other channels of distribution, including the Internet, that Licensee deems desirable. The license hereby granted extends to The United States, Canada, Italy, United Kingdom, Australia, and Japan only, and to such other countries as Licensor may designate in writing (hereinafter "Territory").

(c) Limitations on License: No license is granted hereunder for the use of the Property for any purpose other than upon or in connection with the Goods. No license is granted hereunder for the manufacture, sale or distribution of Goods to be used as Premiums, for publicity purposes, as giveaways, or to be disposed of under similar methods of merchandising. In the event Licensee desires to sell Goods for such purposes, Licensee acknowledges and agrees that it must first seek and obtain a separate license from Licensor and that the user thereof must also obtain a separate license from Licensor for such use of Goods.

(d) Third Party Manufacturing: Licensee shall be entitled to engage a third party manufacturer of its choosing to make and produce the Goods."

3. Advance, Royalty.

(a) Licensee agrees to pay Twenty Thousand Dollars ($20,000) as a non-refundable advance against royalties earned through Original term payable within five (5) business days of

Licensee's receipt of Licensor's original, signed copy of this Agreement.

(b) Licensee shall recover within the Original Term of this Agreement the advance royalty payment by offsetting royalties earned against said advance until the advance is recouped and shall thereafter make the royalty payments to Licensor as set forth herein.

(c) Licensee agrees to pay Licensor in U.S dollars royalties to Licensor for each unit of the Goods as follows: four percent (4%) of the Net Invoice Price on sales of any Goods featuring the Property packaged individually or in a Multipack (subject to the limitations on Multipacks set forth herein). For the purposes of this paragraph 3(c), a "sale" shall be deemed to have occurred on the earlier of the date of (a) shipment of the Goods to the Licensee's customer or (b) issuance of the invoice for the Goods."

4. **Payment and Reporting.**

Not later than the thirtieth (30th) day after the close of every calendar quarter during the Original Term and any extension thereof, and thereafter so long as any sales are made by the Licensee pursuant to this Agreement, the Licensee shall furnish to the Licensor a full and complete statement showing (i) the total number of Goods sold during such calendar quarter; (ii) the selling price of such Goods; (iii) an itemized list of any deductions which are permitted hereunder; and (iv) the total amount of royalties due to the Licensor for such calendar quarter. An item will be considered to be sold when it is ordered and then invoiced or shipped, whichever is sooner. The Licensee shall pay to the Licensor at the address set forth above such royalties as the statement indicates are due the Licensor. All payments shall be made by company check drawn on U.S. funds payable to "Ultimate Creations, Inc." All late payments shall be subject to a one percent per month (12% annual rate) late charge on all such outstanding amounts.

5. **Quality.**

Licensee acknowledges that if the Goods manufactured and sold by it are of inferior quality in material and workmanship, the substantial goodwill which the Licensor has built up and now possesses in the Property will be impaired. Accordingly, Licensee warrants that the Goods will be of high standard and of such appearance and quality as shall be reasonably adequate and suited to their exploitation and best advantage. Licensee shall submit to Licensor finished art work and/or a facsimile of all Goods to be manufactured, together with its cartons and containers, including packaging and wrapping material, which shall be approved in writing by the Licensor before the Goods are advertised, distributed or sold. Any article submitted and not disapproved within ten (10) days of their receipt of same by Licensor shall be deemed to have been approved. After samples of the Goods have been approved pursuant to this paragraph, Licensee shall not depart therefrom without written consent from Licensor. In the event there is a departure from the approved sample of the Goods made or distributed by Licensee, the Licensor shall have the right, in the reasonable exercise of its sole discretion, to withdraw its approval of such Goods, at which time this Agreement shall automatically terminate with respect to such Goods. Thereupon, Licensee shall cease the use of the Property in the sale, advertising, distribution or use of such Goods immediately upon notice from Licensor; and within twenty (20) days thereafter shall pay all amounts due to Licensor hereunder. If there are other Goods under this Agreement not covered or affected by the foregoing two sentences of this paragraph, this Agreement shall remain in full force and effect as to those other Goods.

6. **Advertising.**

All advertisements and promotional material which Licensee intends to use to promote Goods shall be submitted to Licensor for its written approval prior to publication. Licensor shall have ten (10) days from the date of receipt of said material in which to approve or disapprove it, such approval not to be unreasonably withheld.



MW



UCI 000302

7. **Samples.**

Licensee shall supply Licensor with ninety-six (96) samples of each of the completed Goods, promptly after completion. Licensor shall have the right to purchase additional samples for its own personal use at the actual cost of the Goods.

8. **Books and records.**

The Licensee shall keep during the Original Term and for one (1) year thereafter full, complete and accurate books of account and records covering all transactions relating to the subject matter of this Agreement. Upon reasonable advance notice, during normal business hours and not more than once during any Contract Year, Licensor through its authorized representative, shall have the right to examine such books of account and records and other documents and material in Licensee's possession or under its control insofar as they relate to the manufacture and sale of Goods. In the event that Licensor's representative upon performance of the examination permitted pursuant to this paragraph, shall discover a material discrepancy between the royalty reports and amount of royalties due, the Licensor shall have the right to have such books and records audited by independent certified accountants agreed to by both parties. In the event that the Independent certified accountants confirm such discrepancy, the Licensee shall forthwith pay all amounts found to be due. Any overpayment by Licensee shall be applied against future royalties due hereunder or otherwise promptly refunded to Licensee. The determination of such independent certified accountants shall be binding on the parties. The costs of all services performed pursuant to this paragraph shall be born by the Licensor, unless such discrepancy is greater than five percent (5%), in which case the Licensee shall pay all of such costs.

9. **Goodwill.**

Based on the representations and warranties of Licensor contained herein, Licensee acknowledges that the Property is unique and original and that the Licensor is the owner thereof. Licensee shall not, during the Original Term of the Agreement or any renewal or extension thereof, dispute or contest, directly or indirectly, the Licensor's ownership of the Property; the Licensor's exclusive right (subject to this license) to use the Property; the validity of any of the copyrights or trademarks pertaining thereto or the Licensor's ownership thereof, nor shall the Licensee assist or aid others in doing so. At the Licensor's request and expense the Licensee shall cooperate with the Licensor in preventing or stopping any infringement or unfair use by any third party of the Goods or Property. The Licensor shall determine what action, if any, it elects to pursue in regard to preventing or stopping any infringement or unfair use by any third party of the Goods or Property and shall be under no obligation whatsoever to take action at Licensee's request.

10. **Copyright, Etc.**

(a) The Licensor at its expense shall apply to register trademarks and claims to copyright for any design incorporating the Property, and apply for design patents on the Goods and/or the Property as may be reasonably necessary, in the Licensor's sole discretion, to protect the Licensor's interests. All applications for registration of claims to copyright, where applicable, shall identify the Licensor as the copyright proprietor; all applications to register trademarks shall identify the Licensor as the trademark owner; and all applications for design patents shall correctly identify the inventor and shall be assigned to the Licensor at no additional cost.

(b) If Licensor requires any specimens of the Goods, or any photographic reproductions of the same, for use in filing copyright claims, where applicable, or trademark or design patent application, Licensee shall provide the Licensor with the same at Licensor's expense.

(c) At Licensor's request, the Licensee shall execute assignments in favor of Licensor of any and all copyrights, trademarks or other intellectual property rights of whatever kind relating to the Goods and/or the Property without further consideration and Licensee will upon the request of Licensor assign to the Licensor any rights, if any, which Licensee may have acquired through its use of the Property.

(d) Licensee warrants that it will provide a legally sufficient copyright notice on the Goods and packaging, wrapping, advertising and promotional material bearing any reproductions of the Goods or the Property, in the following format:

**Ultimate Warrior TM/© 2006 Ultimate Creations, Inc. licensed by CMG Worldwide**

(e) Licensee warrants that it will provide a legally sufficient trademark notice by prominently displaying the letters ™ (or the sign ® if so specified by the Licensor) against every occurrence of Property on the Goods and against every occurrence of the Property on packaging, wrapping, advertising and promotional material for the Goods.

(f) Licensee warrants that it will take such precautions as are necessary to insure that any promotional materials for the Goods which utilize the Property made by its customers bear the Licensor's copyright and/or trademark notice as provided in paragraph 10 (d & e).

**11. Right of Termination.**

(a) Licensor's Right to Terminate this Agreement. Without prejudice to any other rights which it may have either under the provisions of this Agreement or otherwise, Licensor shall have the right to terminate this Agreement, or a portion thereof, upon written notice to Licensee, at any time that the following may occur:

(i) If full and regular production and marketing has not commenced within three (3) months from the date of this Agreement. Any individual categories of Goods granted in paragraph 2(a) not in distribution throughout the Territory within five (5) months are subject to revocation of production rights. If the Goods are out of production for more than three consecutive months, Licensor may terminate the production rights for the particular category of Goods, that particular Good in a particular territory, or terminate the entire Agreement at Licensor's sole discretion.

(ii) If Licensee shall fail on more than one occasion during any Contract Year to make any payment due hereunder or to deliver any of the statements herein referred to, and if such default shall continue for a period of five (5) business days after written notice of such default is sent by Licensor to Licensee.

(iii) If Licensee is involved in any act of bankruptcy or insolvency, then Licensor shall have the right to terminate this Agreement. Notwithstanding the foregoing, Licensor shall, at any time during the Original Term of this Agreement, have the option of demanding an assurance from Licensee of Licensee's on-going ability to perform the provisions of this Agreement. Unless reasonable and adequate assurance is received by Licensor from Licensee concerning Licensee's ability to perform, Licensor shall have the right to terminate this Agreement.

(b) Licensee's Right to Terminate this Agreement. Without prejudice to any other rights which it may have either under the provisions of this Agreement or otherwise, upon the default by the Licensor in the performance of any of its obligations provided for in this Agreement or upon the inaccuracy of any representation or breach of any warranty made by Licensor in this



UCI 000304

Agreement; provided, however, that the Licensor shall be entitled to ten (10) business days prior written notice from the Licensee of such breach or default, and this Agreement shall not be terminated if the breach or default is cured within such ten (10) business day period.

12. **Sales after Expiration.**
Upon expiration of this Agreement, Licensee shall be permitted to sell or ship its remaining inventory of Goods for a period of ninety (90) days following the expiration date of this Agreement without the express written consent from the Licensor. If Licensor terminates this Agreement, Licensee shall not be permitted to sell or ship any then-remaining inventory of Goods after the date of Licensor's notice of termination. The Licensee shall not, without prior written consent of the Licensor, sell or ship any such remaining Goods as distress merchandise, or to unaffiliated third parties for eventual resale, or otherwise than in the ordinary course of business. Licensee shall not stockpile inventory prior to expiration or termination of this Agreement for purposes of sale or shipment thereafter. For purposes of this Agreement, a distress sale shall be defined as one in which the merchandise is sold for less than fifty percent (50%) of the normal wholesale selling price.

13. **Rights reserved by Licensor.**
Any and all rights in and to said Property which are not expressly granted to the Licensee are hereby reserved by the Licensor. Any one or more of such reserved rights may be exercised or enjoyed by the Licensor, directly or indirectly, at any and all times.

14. **Remedies.**
All specific remedies provided for in this Agreement shall be cumulative and shall not be exclusive of one another or of any other remedies available in law or equity. Failure of the Licensor to insist upon strict performance of any of the covenants or terms hereof to be performed by the Licensee shall not be construed to be a waiver of any such other covenants or terms. Should Licensor be forced to initiate legal action due to Licensee's breach hereof, then all reasonable legal fees incurred therein by Licensor shall be recoupable by Licensor.

15. **Licensee's Indemnification & Product Liability Insurance.**
During the Original Term, and any extensions or renewals thereof, Licensee hereby agrees to be solely responsible for, to defend and indemnify Licensor and its respective officers, agents and employees, and to hold each of them harmless from any third party claims, demands, causes of action or damages, including reasonable attorney's fees arising out of the distribution or use of the Goods. Throughout the Original Term and any extensions or renewals thereof Licensee will obtain and maintain product liability insurance at least in the amount of $1,000,000 with a deductible of not more than $10,000 (certificate of which shall be furnished to Licensor) providing adequate protection for Licensor and its respective officers, agents, and employees against any claims or demands arising out of any alleged defects in Goods or any use thereof. Such insurance policy shall provide that it may not be cancelled without at least thirty (30) days written notice to Licensor.

16. **Licensor's Warranty.**
Licensor represents and warrants to Licensee that (i) it has the power to enter into this Agreement and perform its obligations hereunder; (ii) it has all rights required in order to license all rights granted to Licensee hereunder; and (iii) there is no obstacle (legal or otherwise) concerning the Licensee's use of the Property and that the Licensee's use of the Property as authorized hereunder will not infringe the rights of any third party, and will not result in any claims of unfair competition or violation of any other common law right of any third party.. Should any third party assert a claim, demand, or cause of action against Licensee contesting Licensor's ownership of the Property in relation to Licensee's use of the Property under this Agreement, Licensor shall indemnify and hold harmless the Licensee, its officers, directors,



NW

employees and agents from and against all damages, losses, liabilities, suits and expenses (including reasonable attorneys fees and expenses related thereto). To that end, Licensor shall undertake and conduct the defense of any such claim, demand or cause of action. Licensee may, but shall not be obligated to join in such defense and be represented by its own counsel. If Licensee elects to be represented by its own counsel, Licensee will pay its own attorney's fees. Licensee agrees that while it may counsel Licensor concerning the disposition of any such action, Licensor shall have the sole and final decision concerning the disposition of any action which involves the Property and has the right to order the Licensee to dispose of inventory and all works in progress as it sees fit. Licensor shall also have the right, in its discretion, to institute and prosecute lawsuits against third persons for infringement of the rights licensed in this Agreement. Any lawsuit shall be prosecuted solely at the cost and expense of the Licensor and all sums recovered in any such lawsuits, whether by judgment, settlement or otherwise, shall be retained solely and exclusively by the Licensor. Upon request of the Licensor, the Licensee shall execute all papers, testify on all matters, and otherwise cooperate in every way reasonably necessary and desirable for the prosecution of any such lawsuit. The Licensor shall reimburse the Licensee for all reasonable expenses incurred as a result of such cooperation.

17. No Partnership or Joint Venture.

This Agreement does not constitute and shall not be construed as constituting a partnership, agency, or joint venture between Licensor and Licensee. The Licensee shall have no right to obligate or bind Licensor in any manner whatsoever and nothing herein contained shall give or is intended to give any right of any kind to any third party.

18. No Assignment.

Except as provided in paragraph 2(d) above, the license hereby granted is and shall be personal to the Licensee and shall not be assignable by any action of the Licensee or by operation of the law, and any attempt at such assignment shall be null and void. The Licensee shall have no right to grant any sublicenses. This Agreement shall inure to the benefit of and shall be binding upon Licensor's successors and assigns.

19. Notice.

Whenever notice is required to be given under this Agreement, it shall be deemed to be good and sufficient notice if in writing, signed by an officer or an authorized agent of the party serving such notice and sent by telegram, telefax, or mailed by registered or certified mail, to the other party at the address stated above unless notification of a change of address is given in writing.

20. Entire Agreement.

This Agreement contains the entire understanding of the parties. There are no representations, warranties, promises, covenants or understandings other than those herein contained.

21. Confidentiality.

This Agreement and the contents hereof constitute a confidential business relationship between the parties. Each party acknowledges that significant damage could be done to the other one should the terms of this Agreement become public knowledge. Both parties agree that, except as may be required by law, they will not reveal the terms of this Agreement to any third party (excluding agents, attorneys, representatives, and others with whom they have a legal obligation to disclose) and that they will exercise reasonable precautions to insure that neither they nor their employees or agents shall allow the terms of the Agreement to become public knowledge.

**22. Disclaimer.**

This Agreement in no manner absolves Licensee of its responsibility, if any, to procure legally sufficient permission from the copyright owner(s) of the photographs, illustrations, and/or artwork utilized in conjunction with the manufacture and distribution of the Goods. Licensee agrees to indemnify and hold harmless Licensor and its agent(s) from any and all claims made by third parties with respect to copyrighted materials utilized in conjunction with this Agreement.

**23. Construction & Jurisdiction.**

(a) This Agreement shall be construed in accordance with the laws of the state of California.

(b) Nothing in this Agreement is intended to be contrary to the laws of any country or political subdivision thereof. In the event that any of the paragraphs or particular terms or conditions set forth within any paragraphs are held to be unenforceable by a court of record with competent jurisdiction, such paragraph or particular term of condition therein shall be deemed to be stricken from this Agreement within the jurisdiction of such court and the Agreement shall otherwise remain in full force and effect in such jurisdiction and in its entirety in other jurisdictions.

**24. Forum Selection Clause.**

Both parties acknowledge and consent that any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in a court located in the State of California as follows:

Licensee agrees and consents to venue and jurisdiction within any court located in the State of California, agreeing that any such court would have exclusive jurisdiction over any dispute, case or controversy arising under or in connection with this Agreement, and that such any California court shall be a proper forum in which to adjudicate such dispute, case or controversy.

The prevailing party in any action above (including arbitration) shall be allowed to recoup any and all attorney fees, interest and costs therein.

IN WITNESS WHEREOF, the parties hereto have signed by their duly authorized officers as of the day and year first above written.

| "Licensor" | "Licensee" |
|---|---|
| [signature] | [signature] |
| Ultimate Creations, Inc. | JAKKS Pacific, Inc. |
| President Ultimate Creations, Inc. (handwritten) | JAKKS Legal OK BY: [initials] DATE: 3/8/06 (stamp) |

# EXHIBIT B

EXHIBIT B


Asst. #97502
Watch for more of
your favorite Classic Superstars
from the 70s, 80s, & 90s!
14" POSEABLE ACTION FIGURE
FIGURINE ARTICULÉE 35,6 CM
Ultimate Warrior™
Weight: 275 LBS Height: 6'3"
Finishing Moves: Warrior Splash,
Warrior Gorilla Press Slam
Titles: WWE Champion,
WWE Intercontinental Champion
Favorite Quote: "Always Believe!"
Ultimate Warrior™
Poids: 125 kg Taille : 191 cm
Prises de finition: Warrior Splash,
Titres: Champion WWE,
Champion intercontinental WWE
COLLECT THEM ALL
COLLECTIONNE-LES TOUS!

UCI 000335

# EXHIBIT C

EXHIBIT C

DECLARATION OF JAMES M. KENNEDY

I, James M. Kennedy, declare as follows:

1. I am the Executive Vice President of Business and Legal Affairs and Corporate Secretary of THQ Inc. ("THQ"). I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. THQ is a leading worldwide developer and publisher of interactive entertainment software. THQ is publicly listed on the NASDAQ stock exchange under THQI.

3. I understand JAKKS Pacific, LLC ("JAKKS") to be a multi-brand company that designs and markets a broad range of toys and consumer products. JAKKS is publicly listed on the NASDAQ stock exchange under JAKK.

4. THQ and JAKKS participate in a joint venture under which THQ develops and publishes video games under a license from the WWE. There is no relationship or connection between THQ and JAKKS other than this limited joint venture.

5. THQ and JAKKS are completely separate and distinct companies. The companies do not have any common managers or directors.

6. THQ has no knowledge of or control over JAKKS's activities in connection with action figures, including JAKK's licensing practices. In fact, until UCI produced a copy of the JAKKS Agreement in this litigation, THQ was not aware that the agreement even existed.

7. JAKKS does not actively participate in the video game joint venture, and it has no role or input on THQ's licensing decisions regarding the content of the WWE games.

Executed on April 17, 2008 at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

James M. Kennedy